James C. JENKINS and Lula M. Jenkins,
Plaintiffs–Appellants,

v.

Colin WOOD, Rick Sabel, John Does, KBI
Strike Force Agents; John Does, City of
Topeka Swat Team Law Enforcement
Personnel, each in their individual ca-
pacities; City of Topeka, Defendants–
Appellees.

No. 95–3091.

United States Court of Appeals,
Tenth Circuit.

April 16, 1996.

Pantaleon Florez, Jr. of Florez & Frost, P.A., Topeka, Kansas, for Plaintiffs–Appellants.

Betty J. Mick (Carla J. Stovall, Attorney General, John J. Knoll, Assistant Attorney General, and M.J. Willoughby, Assistant Attorney General, with her on the brief), Topeka, Kansas, for Defendants–Appellees Colin Wood and Rick Sabel.

David D. Plinsky, Chief of Litigation, City of Topeka, Topeka, Kansas, for Defendant–Appellee City of Topeka.

Before BRORBY, EBEL and HENRY, Circuit Judges.

BRORBY, Circuit Judge.

This case concerns a search of the home of James C. Jenkins, Sr., and Lula M. Jenkins. Mr. and Mrs. Jenkins sued the defendants pursuant to 42 U.S.C. § 1983, claiming the defendants' participation in the search violated rights secured by the Fourth Amendment to the United States Constitution. The district court granted the defendants-appellees' motion for summary judgment, and Mr. and Mrs. Jenkins appealed. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

## I. Standard of Review

 We review de novo a grant of summary judgment, applying the same standard used by the district court. Summary judgment is appropriate if the record reveals that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When applying this standard, we examine the factual record in the light most favorable to the party opposing summary judgment, extending to that party all reasonable factual inferences. While the movant bears the burden of showing the absence of a genuine issue of material fact, the movant need not negate the nonmovant's claim. If the movant carries this initial burden, the nonmovant may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof. An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir.1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). If there is no genuine issue of material fact in dispute, then we next determine if the district court correctly applied the substantive law.

## II. Background

When read in the light most favorable to Mr. and Mrs. Jenkins, the record reveals the following facts.

At all times relevant to this dispute, defendants Rick Sabel and Colin Wood were special agents with the Kansas Bureau of Investigation ("KBI"). In January 1991, through the use of an informant named James Hayes and in cooperation with the City of Topeka Police Department, the KBI was investigating James Jenkins, Jr., for involvement in narcotics. In mid-January, Mr. Hayes informed KBI Agent Ray Lundin, who is no longer a party to this action, that he had contacted James Jenkins, Jr., at what appeared to be an upstairs apartment in a home located at 1261 S.W. Clay in Topeka. Acting on this information, Agent Lundin observed James Jenkins, Jr., descend an external staircase from the second story of the home at 1261 S.W. Clay and conduct a crack cocaine transaction with the informant, Mr. Hayes. (*Id.*) When questioned in late January 1991 by an officer of the Topeka Police Department, James Jenkins, Jr., gave 1261 S.W. Clay as his residential address.

On February 18, 1991, Mr. Hayes contacted KBI Agents Lundin and Sabel to inform them that James Jenkins, Jr. and two other men kidnapped him at gunpoint and then took him to 1201 Lincoln in Topeka, where they robbed, beat and interrogated him about "snitching." Mr. Hayes was eventually released upon convincing his assailants he worked for James Jenkins, Jr., and was not a snitch. That evening, after treatment at a hospital, Mr. Hayes gave a complete statement to the KBI. Upon consultation with an assistant attorney general assigned to the KBI, Agents Lundin and Sabel decided to obtain search warrants for 1201 Lincoln and what they believed to be an upstairs apart-

ment at 1261 S.W. Clay. On the night of February 18, 1991, based on an affidavit submitted by Agent Lundin, a Kansas district judge signed search warrants for the two residences. The warrant for 1261 S.W. Clay authorized a search of "[t]he upstairs apartment ... the door being on the second floor facing West at the rear of the building." The warrant listed the following items for which the officers could search:

> Blood, $275.00 in cash, a small caliber blue semi auto pistol, a single barrel sawed off shot gun, a black cloth trench coat, a blue sweat shirt with pocket on left sleeve and loop in back, and a sports insignia on the left breast, a key with room 161 engraved on it, and items identifying occupants of the premises including mail and utility bills etc.

At about 11:40 p.m. February 18, 1991, officers of the Topeka Police Department assisted KBI agents in executing the search warrant at 1261 S.W. Clay. The search began with a member of the Topeka Police Department throwing a distraction device known as a "flash bang" through the second story entrance. Another Topeka Police officer rammed open the second story door, allowing the search team to enter the home. As the officers entered the home they yelled, "Police search warrant." James Jenkins, Sr. (hereinafter Mr. Jenkins), his wife, Lula Jenkins, and their daughters were the only persons in the house when the officers executed the search warrant. According to Mr. Jenkins' later testimony, James Jenkins, Jr., had not lived in the house for over a year.

As it turned out, there was no upstairs apartment at 1261 S.W. Clay, though the home did have outside stairs that connected to one of three upstairs bedrooms. At the time the Topeka Police officer threw the "flash bang" through the upstairs entrance, Mr. Jenkins was making his way up his home's internal staircase. As he reached the top of the stairs, the explosion knocked him down the stairs. At this point, Mr. Jenkins became "aware that these people[ ] were all around everywhere shooting and carrying

on." All told, Mr. Jenkins heard "four or five shots or more," but his later attempt to find any bullets or bullet holes turned up "maybe a possibility of one" of which he "wasn't sure." Upon hearing the commotion and not knowing who was in his home, Mr Jenkins ran to grab a shotgun he kept in his bedroom, which was apparently located in the downstairs half of the house. As he emerged from his bedroom, Mr. Jenkins was met by two law enforcement officers [1] who told him to drop the gun, get on the floor, and put his hands behind his back. The officers handcuffed him face-down on the floor at gunpoint. One of the officers was a member of the Topeka Police Department and the other was a KBI agent. According to Mr. Jenkins, the KBI agent was a slender, white man of medium height, and in his mid-forties. Otherwise, Mr. Jenkins could not identify the agent. While the two officers held Mr. Jenkins at gunpoint, they inquired about his son, James Jenkins, Jr., and asked that he tell them where they could find him. After Mr. Jenkins had been on the floor for over twenty minutes, Agent Sabel came down the home's internal staircase and saw Mr. Jenkins on the floor. Agent Sabel examined a driver's license other officers had placed on Mr. Jenkins' back and directed the officers to uncuff Mr. Jenkins and allow him to sit down. Mr. Jenkins got up and took a seat in a chair near his wife, who by that time was sitting on the couch. At the time Mr. Jenkins sat in the chair, his two daughters had already been taken down from their upstairs bedrooms and were in the room with him and his wife.

When Lula Jenkins, Mr. Jenkins' wife, heard the flash bang, she remembered her daughters upstairs and started up the stairs to check on their safety. An officer met Mrs. Jenkins at gunpoint, ordered her back down the stairs, and yelled at her to get down on the floor in the same room as her husband. Because of a back injury, Mrs. Jenkins did not immediately obey the officer. Finally, Mrs. Jenkins got face-down on the floor in a spread-eagle position as the officer advised.

---

1. Unless otherwise indicated, we use the terms "officer" or "officers" generically to describe unidentified or unknown law enforcement personnel who participated in the search of the Jenkinses' home.

She was not handcuffed, but was held at gun point prostrate on the floor for about twenty minutes. At one point an officer walked up to Mrs. Jenkins, pointed his gun at her head and said, "You tell me where your son is or I will shoot." Other than to say he was a "real big guy . . . kind of casually dressed," Mrs. Jenkins could not identify this officer. Lying on the floor, Mrs. Jenkins grew concerned about her youngest daughter, who suffered from asthma and was having great difficulty breathing. Mrs. Jenkins pleaded with the officers to let her get up and help her daughter with her inhaler. One of the officers told Mrs. Jenkins if she didn't shut her "goddamn mouth . . . he was going to slap the shit out of her." After Mrs. Jenkins had been on the floor about twenty minutes, officers allowed her to get off the floor. The officers righted a couch that had been knocked over and let Mrs. Jenkins sit on the couch.

Agent Sabel, who was one of the officers in charge of the search, entered the Jenkinses' home through the second-story door that had been rammed open at the search's inception. As he came through the doorway, an officer informed him the flash bang had left a burn mark on the floor. Agent Sabel stopped momentarily and observed the burn mark. He then walked through the rest of the upstairs of the home, examining the other rooms and closets to assure himself no undiscovered persons were hiding in the residence. After completing his initial walk-through of the upstairs, Agent Sabel heard a request that he come downstairs. It is at this point that Agent Sabel first walked downstairs, saw Mr. Jenkins on the floor, and directed the officers to uncuff Mr. Jenkins and let him sit down. Agent Sabel eventually returned upstairs to check with the officers who were conducting the search. Shortly thereafter, he heard an argument break out downstairs between Mrs. Jenkins and another KBI agent. At this point, Agent Sabel went back downstairs and relieved the agent to prevent the situation from getting, in his words, "out of hand." Agent Sabel stayed downstairs with the Jenkinses for the remainder of the search. He talked with Mr. and Mrs. Jenkins and their two daughters, "trying to keep them calmed down."

Agent Colin Wood was the KBI agent assigned to lead the search for evidence in what was thought to be the second story apartment at 1261 S.W. Clay. His job was to ensure that evidence was collected and taken into custody, photographs were taken, and the search warrant returned. Agent Wood entered the Jenkinses' home through the upstairs door after the entry team secured the residence. He walked through each upstairs room to learn the layout of the premises. During the course of this walk-through, Agent Wood noticed the open staircase leading downstairs and quickly realized the upstairs was not a separate apartment.

The discovery that the upstairs was not a separate apartment as described in the warrant led Agents Wood and Sabel, after consultation with an assistant attorney general on the scene, to seek an amended warrant for the entire residence. The attorney left to get the new warrant and returned sometime after 1:00 a.m. February 19, 1991, with a warrant for "All of the house at 1261 S.W. Clay." In the meantime, before the attorney returned with the new warrant, Agent Wood and some officers searched the upstairs pursuant to the original warrant. In the course of this search, they seized the following items: a pair of blue jeans with red stains, $250 in cash, a .22 caliber cartridge, a blue and white sweater with an emblem on it, photographs depicting guns and currency on a bed, and several forms of identification. These items were seized before the attorney returned with the second warrant, and all were found in the upstairs bedroom through which the search team originally entered the residence.

Before the second warrant arrived, officers searched the downstairs and basement of the Jenkinses' home. According to Mr. Jenkins, "they w[ere] going through everything." This search of the downstairs and basement was occurring at approximately the same time officers uncuffed Mr. Jenkins and permitted him to sit down. There is no evidence to indicate Agent Wood participated in the search of the home's downstairs or basement. Agent Wood went downstairs a single time, and that was for the purpose of giving Mr. Jenkins a copy of the search warrant after

the upstairs search and seizure was completed. Agent Wood and the other officers left the premises shortly after Agent Wood gave Mr. Jenkins a copy of the warrant.

Damage caused to Mr. and Mrs. Jenkins' home during the search and seizure included kicked-in doors, broken windows, broken furniture, damaged ceilings and walls, burned carpeting, a broken glass piggy bank, a turned over aquarium, a broken stereo, and a destroyed shoe. Mr. and Mrs. Jenkins both claim mental pain and suffering.

Mr. and Mrs. Jenkins filed suit against, *inter alia*, Agent Sabel, Agent Wood, and the City of Topeka pursuant to 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The Jenkinses claimed Agents Sabel and Wood deprived them of their rights under the Fourth Amendment by using excessive force and subjecting them to a warrantless search of their residence without probable cause.[2] With respect to the City of Topeka, Mr. and Mrs. Jenkins claimed the municipality intentionally or with deliberate indifference to their rights authorized or tolerated a custom or practice of excessive force by the Topeka Police Department. The Jenkinses also claimed the City was deliberately indifferent to their rights to be free from a warrantless search of their residence without probable cause. In the pretrial order agreed to by the parties, Mr. and Mrs. Jenkins added to or refined their claims by contending the defendants used the search warrant for the Jenkinses' home as a pretext to search for and arrest James Jenkins, Jr. They also contended "the supervisory officers of the City on the scene failed to adequately supervise the assisting officers to prevent the constitution[al] deprivations complained of herein with deliberate indifference to the rights of Plaintiffs." This allegation did not detail who the alleged supervisory offers were.

After extensive discovery, the City of Topeka and Agents Sabel and Wood filed motions for summary judgment. In its motion, the City argued there was no evidentiary support for the Jenkinses' claims the City had customs or practices of using excessive force during searches; permitting or condoning warrantless, pretextual searches; or failing to supervise adequately its police officers during searches. Agents Sabel and Wood argued: (1) there was no evidentiary basis showing they personally participated in any of the alleged unconstitutional conduct; (2) the search warrants were valid and not secured by illegal means or for an illegal pretextual purpose; (3) no excessive force was used in execution of the search; (4) they are, in their official capacities, entitled to Eleventh Amendment immunity; and (5) they are, in their individual capacities, entitled to qualified immunity.

The district court granted the defendants' motions for summary judgment, and Mr. and Mrs. Jenkins filed this appeal.

### III. Discussion

#### A. City of Topeka

We begin our review of the district court's decision with the Jenkinses' claim against the City of Topeka. A municipality may not be held liable under 42 U.S.C. § 1983 simply because it employs a person who violated a plaintiff's federally protected rights. *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). To establish municipal liability, a plaintiff must show (1) the existence of a municipal custom or policy and (2) a direct causal link between the custom or policy and the violation alleged. *City of Canton v. Harris*, 489 U.S.

---

2. Mr. and Mrs. Jenkins' complaint also alleged a due process claim and a state law tort claim. We do not address these claims because, for whatever reason, they have not been raised on appeal.

378, 385, 109 S.Ct. 1197, 1202, 103 L.Ed.2d 412 (1989); *Hinton v. City of Elwood,* 997 F.2d 774, 782 (10th Cir.1993). If the plaintiff asserts the alleged custom or policy comprised a failure to act, he or she must demonstrate the municipality's inaction resulted from "deliberate indifference to the rights" of the plaintiff. *Harris,* 489 U.S. at 389, 109 S.Ct. at 1205. More specifically, if the inaction theory rests on an alleged failure to train, the plaintiff must prove "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need" for additional training. *Id.* at 390, 109 S.Ct. at 1205. Ordinarily, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose [municipal] liability." *Butler v. City of Norman,* 992 F.2d 1053, 1055 (10th Cir.1993). In the case where a plaintiff seeks to impose municipal liability on the basis of a single incident, the plaintiff must show the particular illegal course of action was taken pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being sued. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483–85, 106 S.Ct. 1292, 1300–01, 89 L.Ed.2d 452 (1986); *Butler,* 992 F.2d at 1055 (the plaintiff must prove the single incident was "caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker").

█ Mr. and Mrs. Jenkins have pointed to no evidence or reasonable inferences therefrom which could lead a reasonable jury to find for them on their claim against the City of Topeka. Neither the Jenkinses' brief nor the record admits to any evidence that the City of Topeka had a custom or policy of permitting its officers to use excessive force or execute illegal warrants. Even if we assume for the limited purposes of this discussion that incidents of excessive force took place during the search of the Jenkinses' home, there is no evidence to indicate a direct causal link between any municipal custom or policy and the violations alleged. *See Harris,* 489 U.S. at 385, 109 S.Ct. at 1202. Nor is there any evidence the City of Topeka promoted through some custom or policy the execution of illegal warrants. Mr. and Mrs. Jenkins seek to get around this scarcity of evidence by arguing, "When Defendant Sabel allowed the absolute infringement of the Plaintiffs' Fourth Amendment rights, he adopted a particular course of action which represented an act of official government policy under *Pembaur.*" Notwithstanding the obvious question as to whether a field officer becomes a policy maker by simply adopting a particular course of action in the execution of a single search warrant, the Jenkinses' argument fails for a more fundamental reason. Agent Sabel worked for the KBI, not the City of Topeka, and it is the City of Topeka the Jenkinses are suing. Mr. and Mrs. Jenkins have offered no evidence or legal authority to support the notion that Agent Sabel, as a KBI agent, could act as a policy maker for the City of Topeka. Accordingly, we conclude the district court properly granted summary judgment in favor of the City of Topeka.

### B. Agents Sabel and Wood

█ We now turn to Mr. and Mrs. Jenkins' claims against Agents Sabel and Wood. To prevail on a claim for damages for a constitutional violation pursuant to 42 U.S.C. § 1983, a plaintiff must establish the defendant acted under color of state law and caused or contributed to the alleged violation. *Ruark v. Solano,* 928 F.2d 947, 950 (10th Cir.1991); *Snell v. Tunnell,* 920 F.2d 673, 700 (10th Cir.1990); *Bennett v. Passic,* 545 F.2d 1260, 1262–63 (10th Cir.1976). The plaintiff must show the defendant personally participated in the alleged violation, *Bennet,* 545 at 1262–63, and conclusory allegations are not sufficient to state a constitutional violation. *Wise v. Bravo,* 666 F.2d 1328, 1333 (10th Cir.1981). Though state actors who participate in a violation in a supervisory role may incur liability, " 'there is no concept of strict supervisor liability under section 1983.' " *Ruark,* 928 F.2d at 950 (quoting *Harris v. Greer,* 750 F.2d 617, 618 (7th Cir.1984)). In other words, it is not enough for a plaintiff merely to show a defendant was in charge of other state actors who actually committed the violation. Instead, just as with any individual defendant, the plaintiff must establish

"a deliberate, intentional act by the supervisor to violate constitutional rights." *Woodward v. City of Worland,* 977 F.2d 1392, 1399 (10th Cir.1992) (citing *City of Canton,* 489 U.S. at 389, 109 S.Ct. at 1205). A plaintiff may satisfy this standard by showing the defendant-supervisor personally directed the violation or had actual knowledge of the violation and acquiesced in its continuance. *Woodward* 977 F.2d at 1400 (citing *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1478 (3d Cir.1990)); *see also Kite v. Kelley,* 546 F.2d 334, 337 (10th Cir.1976).

With respect to Mr. and Mrs. Jenkins' claims against Agent Wood, they have not come forward with evidence indicating he personally participated in any of the alleged violations. First, Agent Wood did not participate in obtaining the search warrant. Second, he did not enter the residence until after it had been secured. Third, he confined his searching activities to the upstairs portion of the home and focused particularly on the room into which the upstairs entrance entered. Fourth, he did not go down to the first story of the Jenkinses' home until after he had completed his gathering of evidence. Neither Mr. nor Mrs. Jenkins identified Agent Wood as one of the officers who threatened them or subjected them to excessive force. Also, they have not directed us to any evidence personally linking Agent Wood to any of the damage in their home. With respect to the Jenkinses' claim the search was actually a pretext for finding and arresting their son, James Jenkins, Jr., there is no evidence connecting Agent Wood to such a motive. Actually, the fact that Agent Wood seized and carefully catalogued several items matching items described in the warrant directly contradicts the Jenkinses' allegation he participated in a pretextual search. Because the Jenkinses' brief does not argue Agent Wood became liable as a supervisor of the alleged violations, we will not consider this theory as it might apply to him. *See State Farm Fire & Casualty Co. v. Mhoon,* 31 F.3d 979, 984 n. 7 (10th Cir.1994) (issues not argued in brief are deemed waived). Essentially, the Jenkinses' arguments with respect to the liability of Agent Wood amount to a claim that he should be held liable because he was in the home when the alleged deprivations occurred. Such conclusory allegations are not sufficient to avoid summary judgment in a case of alleged constitutional violation. *See Wise,* 666 F.2d at 1333.

Turning to the Jenkinses' claims against Agent Sabel, we conclude the evidence is not sufficient to implicate Agent Sabel as a personal participant in the alleged violations. First, Mr. and Mrs. Jenkins have brought forward no evidence indicating Agent Sabel participated in the use of excessive force against them personally. Agent Sabel entered the residence after the entry team. Upon first going downstairs, he directed the officers to uncuff Mr. Jenkins and allow him to sit down. By this time, Mrs. Jenkins was already off the floor and seated on the couch. Though Mr. and Mrs. Jenkins have detailed some disturbing behavior to support their claims of excessive force, their allegations relate to the time period when they were held face-down on the floor at gunpoint. Agent Sabel was partly responsible for curing this situation, and there is no logical or evidentiary support for the proposition that Agent Sabel participated in what happened before he came downstairs and directed the officers to uncuff Mr. Jenkins. As with Agent Wood, neither Mr. nor Mrs. Jenkins identified Agent Sabel as one of the officers who subjected them personally to excessive force. With respect to the damage done to their property, there is no evidence indicating Agent Sabel personally participated in any of the destruction.

Though the Jenkinses also contend Agent Sabel subjected them to a warrantless search of their home without probable cause, their brief offers no explanation or argument as to why the original warrant was illegal or not supported by probable cause. We take this omission as a concession that the officers, including Agent Sabel, entered the premises in reliance on a valid warrant. *See Mhoon,* 31 F.3d at 984 n. 7 (issues not argued in brief are deemed waived). Furthermore, Mr. and Mrs. Jenkins have brought forward no evidence that would rebut the evidentiary presumption that when a police officer carries out a search based on a

warrant it is a good faith search. *United States v. Leon,* 468 U.S. 897, 922, 104 S.Ct. 3405, 3420, 82 L.Ed.2d 677 (1984); *United States v. McKneely,* 6 F.3d 1447, 1454 (10th Cir.1993). Therefore, we turn to the Jenkinses' claim that Agent Sabel illegally exceeded the scope of the original warrant by searching the downstairs portion of their home before the amended warrant arrived. Though it is uncontroverted that Agent Sabel was on the first floor of the Jenkinses' home before the assistant attorney general returned with the amended warrant, there is no evidence indicating Agent Sabel participated in a search of that part of the house. In fact, in their response to the defendants' motion for summary judgment, the Jenkinses admitted "Agent Sabel did not physically participate in any of the search of the residence." The Jenkinses have not argued that Agent Sabel's mere presence in the downstairs violated their Fourth Amendment rights; therefore, we will not consider such a theory.

Mr. and Mrs. Jenkins also contend Agent Sabel used the valid search warrant as a pretext to look for and arrest James Jenkins, Jr. There is scant, if any, evidence Agent Sabel harbored any such intent. While it is true Agent Sabel and other officers seemed concerned whether James Jenkins, Jr., was in the house, there is no evidence they obtained and executed the search warrant as a pretext for looking for him. Given the officers' knowledge of James Jenkins, Jr.'s propensity for violence and their belief he lived in the Jenkinses' home, they had every right to be concerned about his presence. In any event, Mr. and Mrs. Jenkins' pretext argument relies primarily on our decision in *United States v. Guzman,* 864 F.2d 1512, 1517 (10th Cir.1988), a decision we overruled in the time since the Jenkinses filed their brief. *United States v. Botero–Ospina,* 71 F.3d 783 (10th Cir.1995) (en banc), *petition for cert. filed,* S.Ct. No. 95–8121, Apr. 1, 1996.

█ Finally, Mr. and Mrs. Jenkins contend Agent Sabel is liable as a supervisor in that he "was present, if not actively participating, when excessive force was used in both the search of [the Jenkinses' home] and the personal seizures of both [Mr. and Mrs. Jenkins]. Defendant Sabel did nothing to prevent it, and thus the nexus between his supervision and the Fourth Amendment violations is apparent." In their response to Agent Sabel's motion for summary judgment, Mr. and Mrs. Jenkins did not assert a supervisor theory of recovery against Agent Sabel. The only arguments in the Jenkinses' response that could be construed as asserting a theory of supervisor liability relate to Agent Wood, and as we have already discussed, the Jenkinses' brief to this court omits any argument that Agent Wood should be held liable as a supervisor. Except in cases of "the most manifest error," this court will not entertain issues on appeal that were not argued to the district court. *Sac & Fox Nation v. Hanson,* 47 F.3d 1061, 1063 (10th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 57, 133 L.Ed.2d 21 (1995); *see Rademacher v. Colorado Ass'n of Soil Conservation Dists. Medical Benefit Plan,* 11 F.3d 1567, 1571 (10th Cir.1993) (issues not argued to the district court "ordinarily will not be considered on appeal"). Given the general dearth of evidence linking Agent Sabel to the alleged violations, we find it improper to depart from the general rule. Therefore, we will not consider Mr. and Mrs. Jenkins' claim that Agent Sabel should be held liable for his role as a supervisor in the search of their home.

For the reasons given above, the district court's grant of summary judgment in favor of the City of Topeka, Colin Wood, and Rick Sabel is **AFFIRMED.**

HENRY, Circuit Judge, concurring.

I concur in the majority's legally appropriate disposition. I write separately only to emphasize the apparent inappropriateness of the governmental action, which seems to push the envelope of "reasonableness" under the Fourth Amendment dangerously far.

The defense of the Kansas Bureau of Investigation and the City of Topeka rests upon the fact that neither Mr. nor Mrs. Jenkins could identify the officer or officers responsible for the egregious conduct that occurred in their home in the middle of the night. The defendants do a good job of pointing the finger at each other, and al-

though this defense is legally successful in this case, it leaves quite a lot to be desired from the standpoint of the Fourth Amendment. Indeed, the district court also expressed its view that the Jenkins "have testified to facts which might support a claim of excessive force against one or more officers executing the search warrant." (Mem. and Order dated February 16, 1995, at 23.)

I agree with the district court's conclusion. The warrant, requested at 10:48 p.m. and executed at 12:30 a.m. (Mem. and Order dated February 16, 1995 at 7, 8), was served in a fashion that would have almost certainly been illegal under federal statutory law. *See* 18 U.S.C. § 3109 (requiring federal law enforcement officers to announce their authority and purpose prior to breaking doors or windows in the execution of a search warrant); *United States v. Stewart,* 867 F.2d 581 (10th Cir.1989) (applying 18 U.S.C. § 3109 to similar facts).

In determining Fourth Amendment "reasonableness" in excessive force cases, a court must balance "the nature and the quality of the intrusion on the individual's Fourth Amendment interests, against the countervailing governmental interests at stake." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) (internal quotations and citations omitted). The governmental interests served by this commando approach are not apparent. The informant, who alleged Mr. Jenkins Jr. severely beat him, was presumably in the hospital and certainly out of harm's way. Although Mr. Jenkins Jr. had been seen exiting the upstairs apartment a month earlier and had stated that he lived there at that time, no evidence placed Mr. Jenkins Jr. in his parents' home on the night the raid occurred. Believing, as the officers did, that a separate upstairs apartment existed, one would assume the great likelihood of innocent people being present in, at least, the downstairs portion of the building. (Here, the Jenkins' two daughters and Mr. and Mrs. Jenkins Sr. themselves were present.) It seems odd that the home was not observed so that Mr. Jenkins Jr. could be apprehended without flash bangs and no-knock entries that could have resulted in the death of innocent occupants.

Moreover, the search warrant specified items associated with the beating of the government's informant at a different location; such items could just have easily been searched for the following day and would not have required such an entry unless the younger Mr. Jenkins was known to be present in the home.

These governmental interests do not outweigh Mr. and Mrs. Jenkins' Fourth Amendment right to be free from unreasonable flash bang, no-knock, 12:30 a.m., governmental searches of their home. Noting that the standard of review requires this court to examine the factual record in the light most favorable to Mr. and Mrs. Jenkins and extend to them all reasonable factual inferences, the threatening language allegedly used by the police—"You tell me where your son is or I will shoot."—gives me further pause. (Mem. and Order dated February 16, 1995, at 11.)

Nevertheless, the majority opinion clearly states the law's requirements. I agree with the district court that Mr. and Mrs. Jenkins have "not identified sufficient evidence or pointed to any authority demonstrating that either Wood or Sabel may be liable for the such [sic] acts." (Mem. and Order date February 16, 1995, at 23.) Nor have they provided support for their claim that the City of Topeka had a custom or policy of using excessive force in the execution of search warrants. Courts cannot apportion § 1983 liability on a market share basis.

I believe the defendants would do well to reevaluate their policies (or lack thereof)—whoever makes them and whatever they are—regarding the use of such tactics in the execution of search warrants. *See* 1 Wayne R. LaFave, *Search and Seizure* § 1.4(e), at 96–97 & n. 64. (2d ed. 1987); Wayne R. LaFave, *Controlling Discretion by Administrative Regulations: The Use, Misuse, and Nonuse of Police Rules and Policies in Fourth Amendment Adjudication,* 89 Mich. L.Rev. 442 (1990) (both arguing that the creation and implementation of adequate standard procedures by law enforcement agencies would: (1) assist agents in making

**998**

difficult, and often split second, decisions and (2) provide agencies and individual agents an affirmative defense to legal actions); *see also* 18 U.S.C. § 3109 (establishing the standard that federal law enforcement officers must meet before employing no-knock entries); *United States v. Maden,* 64 F.3d 1505 (10th Cir.1995) (reversing the district court's suppression of evidence obtained from a no-knock search because the police satisfied the requirements of 18 U.S.C. § 3109); *Stewart,* 867 F.2d 581 (applying 18 U.S.C. § 3109 to facts similar to those presented in this case).

On this record, these plaintiffs, possibly wronged, may not rely on a constitutional tort for solace. Common law or state tort relief is the normal recourse for actions making as little sense as these.