FILED
United States Court of Appeals
Tenth Circuit

April 7, 2010

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

INGRID MAGOFFE, as Personal
Representative of the Estate of Anthony
Magoffe, deceased, individually and as
next friend of her minor children Anthony
James Magoffe and Jimmy Magoffe;
AZUCENA MICHEL, as Personal
Representative of the Estate of Camerino
Michel Ramirez, deceased, individually,
and as next friend of her minor children,
Melissa Ornelas Michel, Anthony Ornelas
Michel, and Melanie Ornelas Michel, and
JAMES MAGOFFE, individually,

        Plaintiffs - Appellants,

v.

JLG INDUSTRIES, INC, a Pennsylvania
corporation,

        Defendant - Appellee.

UNITED RENTALS NORTHWEST, INC,
an Oregon corporation,

        Defendant.

No. 08-2245
(D.C. No. 1:06-CV-00973-MCA-ACT)
(D. N.M.)

**ORDER AND JUDGMENT**[*]

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished). *Id.*

Before **O'BRIEN**, **SEYMOUR**, and **GORSUCH**, Circuit Judges.

## I.     INTRODUCTION

Camerino Ramirez and Anthony Magoffe were working on the platform of a scissor lift raised to the height of approximately 46 feet.  James Magoffe was supervising the work from the ground.  Unexpectedly, one of the leveling jacks at the base of the lift retracted causing the lift to tip over.  Ramirez and Anthony Magoffe were killed.  James Magoffe was injured.  The workers[1] sued the manufacturer of the scissor lift, JLG Industries (JLG), and the company from whom their employer, Yearout Mechanical, rented the lift, United Rentals Northwest (United Rentals).[2]  Relevant here, the complaint alleged JLG failed to provide sufficient safety warnings.  In fact, United Rentals made unauthorized alterations to the lift, bypassing safety mechanisms.  The district court granted summary judgment in favor of JLG, concluding United Rentals' alterations to the lift were unforeseeable as a matter of law, defeating both strict liability and negligence claims.  We affirm.

## II.     FACTUAL BACKGROUND

A.     The Scissor Lift

In 1999, JLG manufactured a scissor lift and later sold it to United Rentals.  As

---

[1] James Magoffe and the representatives of Anthony Magoffe and Camerino Ramirez brought the complaint.  For the sake of simplicity, we collectively refer to them as "Appellants" unless named individually.

[2] United Rentals settled the lawsuit and is not a party to this appeal.

described by the district court, a scissor lift is "a portable elevator on wheels with a retractable work platform." (Appellants' Appx. at 370.) This particular lift, a JLG Model 500 RTS, moves on four wheels with rubber tires and is capable of extending its work platform 50 feet above the ground. It has two control stations—a "ground control station" located on the lift's base and a "platform control console" located on the work platform.[3] Most field operations are performed from the platform control console, which is connected to the lift's base by two electrical control cables. It houses numerous operating controls, including four leveling jack toggle switches each corresponding to one of the four hydraulic leveling jacks located at each corner of the lift's base. In addition, a platform lift switch raises and lowers the work platform and the PQ controller, a joystick-style device, controls drive direction and steer angle when the lift is being moved horizontally. The platform control console also contains three interrelated speed switches: (1) a drive speed switch (allowing either fast or slow drive speed),[4] (2) an engine speed switch (allowing either high or low engine speed), and (3) a pump speed switch (allowing high or low flow of hydraulic oil).[5] The operation of the lift at high speed is attended by noticeably higher engine noise.

The lift is designed with several safety mechanisms. The lift cut out switch

---

[3] The ground control station is not relevant to this appeal.

[4] At oral argument, JLG indicated fast speed allowed the lift to be driven at two miles per hour while slow speed limited the drive speed to one-half mile per hour.

[5] Because the drive speed, engine speed, and pump speed are regulated together by the Drive Speed Cut Out Switch (DSCOS), they are collectively referred to as the "high-speed functions."

prohibits the work platform from being raised higher than 22 feet unless the lift is leveled and stabilized with the four leveling jacks.[6] The lift also includes a Tilt Alarm Warning Horn to alert the operator if the lift is not level (if the base is sloped more than two degrees in any direction).

Another safety device, the Drive Speed Cut Out Switch (DSCOS), is closed only when the work platform is stowed (not raised over 6 inches). When the work platform is extended above 6 inches, the DSCOS no longer permits the unit's high-speed functions to operate. The DSCOS has another critical function. At the same time it disables the high-speed functions, it disables the leveling jacks by opening a switch.[7] The open switch prevents electrical power from reaching the leveling jacks, effectively making them inoperable; a user cannot extend or retract the leveling jacks until the work platform is lowered to 6 inches or less.

In summary, when the work platform is stowed the leveling jacks can be extended or retracted. If the jacks are retracted, the unit can be driven — at the faster speed when the work platform is stowed and at the lower speed if the work platform is raised more than 6 inches (but less than 22 feet). The work platform cannot be raised above 22 feet

---

[6] From the work platform (in a fully lowered position), the operator uses toggle switches to manipulate the leveling jacks until the lift's base is level, which can be determined from a level bubble located on the lift's base and visible from the work platform.

[7] Industry design standards for scissor lifts with leveling jacks require the manufacturer to integrate an interlock device (cut out switch) to prevent a user from inadvertently retracting the leveling jacks once they are set. The DSCOS satisfied the industry design standard.

- 4 -

unless the leveling jacks are extended, the jacks are bearing weight, and the unit is level

(and, of course, the lift cannot then be moved horizontally). Once deployed the jacks

cannot be moved until the work platform is returned to the stowed position. The leveling

jacks can only be moved by an operator in the work platform.[8]

B.      Operations and Service Manuals

When JLG sold the 500RTS to United Rentals, it included an instruction manual

for users of the lift (the operator's manual). The operator's manual includes information

about the lift's operating functions and a number of warnings and cautions. A

"WARNING" indicates the potential of a "HAZARDOUS SITUATION" resulting in

"SERIOUS INJURY OR DEATH;" a "CAUTION" indicates the potential for a

"HAZARDOUS SITUATION" resulting in "MINOR OR MODERATE INJURY."

(Appellants' Appx. at 74.) The operator's manual includes the following warnings:

> ALL INSTRUCTIONS IN THIS MANUAL ARE BASED ON THE USE
> OF THE MACHINE UNDER PROPER OPERATING CONDITIONS,
> WITH NO DEVIATIONS FROM THE ORIGINAL DESIGN.
> ALTERATION AND/OR MODIFICATION OF THE MACHINE IS
> STRICTLY FORBIDDEN, WITHOUT WRITTEN APPROVAL FROM
> JLG
>
> . . . .
>
> MODIFICATION OR ALTERATION OF AN AERIAL PLATFORM

---

[8] An operator using the lift with leveling jacks retracted (and at a platform elevation of more than 6 inches) cannot move the jacks without first lowering the platform to the stowed position. For instance, if the wind came up while an operator was working at 18 feet, causing stability concerns, the operator would have to lower the platform to the stowed position before he could deploy the leveling jacks. Likewise, if the leveling jacks were in use and the platform was raised above 6 inches the operator would have to lower the platform to the stowed position before he could adjust the leveling jacks.

SHALL BE MADE ONLY WITH PRIOR WRITTEN PERMISSION OF
THE MANUFACTURER.

. . . .

NEVER DISABLE OR MODIFY ANY SAFETY DEVICE. ANY
MODIFICATION OF THE MACHINE IS A SAFETY VIOLATION AND
IS A VIOLATION OF OSHA RULES.

(*Id.* at 74, 200, 201.) The operator's manual includes a caution reading: "DO NOT

OPERATE MACHINE IF HIGH DRIVE SPEED, HIGH ENGINE SPEED, AND HIGH

PUMP SPEED FUNCTIONS OPERATE WHEN [WORK] PLATFORM IS RAISED

ABOVE THE STOWED POSITION." (*Id.* at 204.) The operators manual also includes

a "DAILY FUNCTIONAL CHECK" with instructions telling users, "A FUNCTIONAL

CHECK OF ALL SYSTEMS SHOULD BE PERFORMED . . ." and directing users to

"Raise and lower [the work] platform several times [to] . . . [c]heck that high function

speeds cut out at 6 in[ches] . . . above fully retracted [work] platform height."[9] (*Id.* at

203.) A warning placard is attached to the lift reading in relevant part: "DAILY

SAFETY CHECK LIST . . . 2. TEST HIGH SPEED CUTOUT SWITCHES . . . 6.

CHECK ALL FUNCTIONS . . . TO BE SURE THERE ARE NO MALFUNCTIONS 7.

DO NOT OPERATE MALFUNCTIONING MACHINE . . . FAILURE TO COMPLY

WITH AND CORRECT ANY DEFICIENCIES FOUND IN THE ABOVE MAY

---

[9] In other places, the manual reads: "TO AVOID INJURY DO NOT OPERATE A
MACHINE UNTIL ALL MALFUNCTIONS HAVE BEEN CORRECTED. USE OF A
MALFUNCTIONING MACHINE IS A SAFETY VIOLATION." (Appellants' Appx. at
202, 203.). In two places it reads: "TO AVOID SERIOUS INJURY, DO NOT
OPERATE MACHINE IF ANY CONTROL LEVERS OR TOGGLE SWITCHES
CONTROLLING PLATFORM MOVEMENT DO NOT RETURN TO THE OFF
POSITION WHEN RELEASED." (*Id.* at 203, 204.)

RESULT IN SERIOUS INJURY OR DEATH." (*Id.* at 236.)

The purpose of these multiple cautions and daily testing requirements is to provide a method to alert both operators and mechanics if the DSCOS safety features are not functioning properly. Checking for proper operation of the safety features is not difficult. When high-speed functions are operational, the engine noise is noticeably higher. If high engine noise is present when the work platform is raised above 6 inches, the noise should alert the operator/mechanic of a problem. Engine noise aside, the proper operation of the DSCOS cut out can be confirmed by checking (daily, as the manual specifies) to see if high-speed functions (including high pump speed) are inoperable when the work platform is raised more than 6 inches. While not specifically mentioned in the warnings the proper operation of the safety cutout on the hydraulic jacks can be verified by raising the work platform more than six inches and attempting to move the jacks – if they move there is a problem. If safe practices are followed, an operator or mechanic would be on notice when safety devices were malfunctioning.

United Rentals' 500RTS also included a separate manual for service technicians and mechanics (the service manual). The service manual includes a detailed electrical schematic showing, among other things, the electrical communication between the leveling jack toggle switches and the DSCOS. A representative of United Rentals testified JLG informed his company in the 1990's the leveling jack interlock was connected to the DSCOS and United Rentals recognized the importance of this information. However, the representative could not identify any way United Rentals

specifically passed that critical information along to its mechanics.[10] Nonetheless, common sense dictates a mechanic would consult the service manual (and JLG) prior to modifying critical electrical circuitry, particularly in light of the numerous explicit "no alteration" warnings contained in both the operator and service manuals.

C.    United Rental's Alterations

There is no evidence the lift was incorrectly wired or otherwise defective when JLG sold the lift to United Rentals.[11] In January 2005, United Rentals (then the owner) determined the lift was malfunctioning. Specifically, its high-speed functions were operating when the work platform was raised above 22 feet. Eric Ramos, a mechanic/technician employed by United Rentals, attempted to repair the malfunction. Ramos had never worked or been trained as an electrician and was never instructed on how to make electrical repairs to the lift. According to his testimony, when he opened the platform control console, he did not believe the wiring looked like the wiring diagram provided in the service manual. During 19 hours of work on the lift's wiring system, he tried to reconstruct the wiring as he saw it on the JLG diagram but did not recall exactly what he did. In fact, Ramos made significant alterations to the lift's wiring system which substantially differed from the wiring diagram in JLG's manual.

Relying on expert testimony, the district court described Ramos's alterations:

[T]he wiring in the ground terminal was cut and spliced to make Terminal

---

[10] Appellants emphasized this testimony in their claims against United Rentals but minimize it now.

[11] The date JLG sold the lift to United Rentals is not identified in the record.

No. 24 "hot" or energized any time the ignition was on. Then a pin was added to the platform control box at Location W, and a brown wire with blue markings was added to connect this modified pin with the now-energized Terminal No. 24. Finally, the wiring inside the platform control box was modified so as to connect the newly spliced pin at Location W with the toggle switches that controlled the leveling jacks.

The inspection of the scissor lift involved in the accident also revealed other anomalous modifications. For example, the cable connectors running from the ground terminal also were altered so as to have two female connectors attached to two male connectors at the platform control box, rather than one male and one female as originally designed. In addition, a green light on the platform control box that is designed to switch on when the leveling jacks are set was disconnected.

(Appellants' Appx. at 391-392 (record citations omitted).)

Ramos's rewiring made the high-speed functions of the lift's engine cut out when the work platform was raised above 6 inches. But, critical to the issue here, his rewiring also inadvertently disabled the cut out switch connection between the leveling jack toggle switches and the DSCOS. He created a new power source for the leveling jack toggle switches which continued to provide power to the jacks even when the work platform was raised above 6 inches. His alterations allowed the switches to extend and retract the leveling jacks regardless of the work platform's elevation. They had other unfortunate consequences; his alterations compromised the warnings contained on the equipment and in the operator and service manuals. Normally the cut out of high-speed functions when the work platform was raised over 6 inches would result in lower engine noise. Lower noise would also indicate the DSCOS had cut power to the leveling jack toggle switches. Wiring around the connection between the DSCOS and the leveling jack switches eliminated this audible warning. Nevertheless, the daily checks would reveal the

- 9 -

problem, particularly those requiring the operator to "CHECK ALL FUNCTIONS . . . TO BE SURE THERE ARE NO MALFUNCTIONS" and the operator's manual telling users to perform "[a] functional check *of all systems*" and warning, "TO AVOID INJURY DO NOT OPERATE A MACHINE UNTIL ALL MALFUNCTIONS HAVE BEEN CORRECTED . . ." (*Id.* at 236, 75 (emphasis added).) Because Ramos mistakenly believed "everything [was] functioning the way it should be . . . above [a] height of 22 feet," the lift was placed back into service.[12] (*Id.* at 154.)

More than a year later, on February 20, 2006, Ramos performed an inspection of the lift. His inspection reported the lift was working properly and had not been modified without authorization.[13] United Rentals rented the lift to Yearout Mechanical on March 1, 2006. *See United Rentals Nw., Inc. v. Yearout Mech., Inc.*, 573 F.3d 997, 999 (10th Cir. 2009). On April 1, 2006, Camerino Ramirez and Anthony and James Magoffe were using the lift to install ductwork in an airport hangar approximately fifty feet above the ground. While lowering the work platform, but still approximately 46 feet above the ground, the right rear stabilizing jack retracted and the lift tipped over, injuring James and killing Anthony and Camerino.

### III.     PROCEDURAL BACKGROUND

While Appellant's complaint originally contained a number of claims against JLG,

---

[12] Ramos's deposition testimony indicates he understood there was a connection between the leveling jack switches and the lift's high speed functions, but his assumptions regarding the details of this connection were incorrect.

[13] Apparently his inspection did not include raising the work platform above six inches and attempting to move the hydraulic jacks. Doing so would have revealed the safety problems created by his earlier rewiring.

at oral argument they acknowledged the only remaining claims contend JLG is strictly liable and/or negligent because of its failure to warn about the danger of an unexpected retraction of a leveling jack. Appellants say Ramos's faulty rewiring of the electronics, the subsequent retraction of the leveling jack, and the collapse of the lift, were direct results of JLG's failure to specifically explain the multiple functions of the DSCOS – that it not only controlled the high-speed functions but also disabled the leveling jack toggle switches when the work platform was raised more than six inches. They also argue JLG should have reasonably foreseen the possibility of Ramos's unauthorized and improper modifications and warned potential operators of the danger such acts might present.

Appellants filed a motion for partial summary judgment seeking judgment against JLG for breach of the "duty to warn and provide directions for use to avoid injury or death resulting from the unexpected retraction" of the scissor lift's leveling jacks during operation. (Appellants' Opening Br. at 10.) JLG opposed the motion on procedural and substantive grounds.

JLG filed several motions to exclude some of Appellants' testimonial evidence.[14] Of concern here is a motion to exclude portions of James Magoffe's affidavit. Had he been properly warned of the interrelationship between the DSCOS and the leveling jack toggle switches, it asserted, before using the lift he would have tested the leveling jacks

---

[14] These motions included: (1) JLG's Motion to Exclude Opinions of Charles Proctor; (2) JLG's Motion to Exclude Opinions of Vincent Gallagher; (3) JLG's Motion to Strike Affidavit of Vincent Gallagher; (4) JLG's Motion to Strike Affidavit of Charles Proctor; and (5) JLG's Motion to Strike Affidavit of James Magoffe. The district court granted the motions. Appellants did not appeal from the decisions with respect to Proctor and Gallagher.

with the work platform raised above its stored position. JLG argued his statements were improper under the Federal Rules of Evidence because they were speculative and not rationally based on his perception. Appellants claimed the testimony was admissible because James Magoffe was a safety-conscious construction supervisor and his opinion (about what he would have done in response to a proper warning) was rationally based on his perception, helpful to a determination of whether a better warning would have made a difference, and not based upon scientific, technical or other specialized knowledge.

JLG also moved for summary judgment on all claims, alleging the substantial post-sale modifications to the lift were unforeseeable, thus relieving it of liability under both negligence and strict liability theories. Appellants opposed the motion, raising arguments based on causation and contribution under New Mexico law.

The district court granted JLG's motion to strike James Magoffe's contested statements. It also granted JLG's motion for summary judgment holding, as a matter of law, the unauthorized and improper bypass of the leveling jack cut out by a novice repairman was unforeseeable thus imposing no duty on JLG to warn of such a possibility. It said:

> [New Mexico's] courts usually leave questions about the foreseeability of
> unintended post-sale misuse of a product for the jury to decide at trial. On
> the other hand, there are cases where the post-sale use or modification of a
> product is so unforeseeable that the matter can be taken from the jury. In
> retrospect, almost nothing is entirely unforeseeable. A test of
> foreseeability, however, does not bring within the scope of a defendant's
> liability every injury that might possibly occur. Foreseeability has been
> defined as that which is *objectively reasonable* to expect, not merely what
> might conceivably occur. This requirement of objective reasonableness
> provides a basis for the Court to conclude, as a matter of law, that certain
> risks entailed by post-sale modifications are too unforeseeable to establish a

defect or unreasonable risk of injury in the product itself or in the existing warnings and directions that accompany it at the time of sale.

(*Id.* at 386 (quotations and citations omitted).) It also denied Appellants' motion for partial summary judgment, concluding the motion did "not provide an appropriate vehicle for partial adjudication of the duty and breach elements of [Appellants'] failure-to-warn claims." (*Id.* at 437.) Appellants appeal from both decisions. As a collateral matter, they also request we certify questions of New Mexico law to the New Mexico Supreme Court. We deny the certification request[15] and affirm.

## IV. DISCUSSION

In diversity cases like this, the substantive law of the forum state governs the analysis of the underlying claims, "but we are governed by federal law in determining the propriety of the district court's grant of summary judgment." *Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1016 (10th Cir. 2001). Accordingly, "[w]e review the grant of summary judgment de novo, applying the same standard as the district court pursuant to Rule 56(c) of the Federal Rules of Civil Procedure." *Gwinn v. Awmiller,* 354 F.3d 1211, 1215 (10th

---

[15] The New Mexico Rules of Appellate Procedure permit the New Mexico Supreme Court to accept a certification request from any federal court. *See* NMRA, Rule 12-607(A)(1) (2009) ("The Supreme Court may answer . . . questions of law certified to it by a court of the United States . . . ."); *compare* California Rules of Court, Rule 8.548(a) (permitting the California Supreme Court to only consider a certification request from the United States Supreme Court, a United States Court of Appeals, or the court of last resort from any state, territory or commonwealth). Appellants made no certification request in the district court. "We generally will not certify questions to a state supreme court when the requesting party seeks certification only after having received an adverse decision from the district court." *In re Midpoint Dev., L.L.C.*, 466 F.3d 1201, 1207 (10th Cir. 2006) (quotations omitted). This case offers no reason to depart from our customary practice.

Cir. 2004). We also review de novo the district court's interpretation of substantive state law. *Enfield ex rel. Enfield v. A.B. Chance Co.*, 228 F.3d 1245, 1247 (10th Cir. 2000).

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).[16] "While the movant bears the burden of showing the absence of a genuine issue of material fact, the movant need not negate the nonmovant's claim." *Jenkins v. Wood,* 81 F.3d 988, 990 (10th Cir. 1996). Once the movant carries this burden, the nonmoving party must "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Id.* An issue of material fact is genuine if a reasonable jury could find in favor of the nonmovant. *Id.* While our summary judgment standard requires us to consider the evidence in the light most favorable to the nonmoving party, it does not require us to disregard undisputed evidence favoring the moving party. *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1168 (10th Cir. 2007).

A.    Reasonable Foreseeability Under New Mexico's Law

In New Mexico, "a manufacturer or seller of a product may be held [strictly] liable after a substantial modification of the product if the modification was reasonably foreseeable." *Chairez v. James Hamilton Constr. Co.*, 215 P.3d 732, 737 (N.M. Ct. App.

---

[16] The district court applied the proper rule although it used insignificantly different language. Rule 56 has been slightly altered effective December 1, 2009. The modifications are irrelevant to our discussion.

2009) (citing *Webb v. Rodgers Mach. Mfg. Co.*, 750 F.2d 368, 372 (5th Cir. 1985) (under Texas law, "a manufacturer may be held liable where the subsequent alteration leading to the accident was foreseeable by the manufacturer"); *Smith v. Verson Allsteel Press Co.*, 393 N.E.2d 598, 604 (Ill. App. Ct. 1979) (if a foreseeable modification to a machine contributes to the plaintiff's injury, the manufacturer may still be liable); *Eck v. Powermatic Houdaille, Div. of Houdaille Indus., Inc.*, 527 A.2d 1012, 1018 (Pa. Super. Ct. 1987) ("[T]he concept of 'foreseeability' is a significant factor in determining whether a manufacturer or seller will be held responsible for injuries resulting after post-sale modifications of a product have been made."); *Zacher v. Budd Co.*, 396 N.W.2d 122, 134 (S.D. 1986) ("The overriding consideration . . . concerning both the alleged substantial changes or alterations . . . [is] the doctrine of foreseeability."). "Each case must be considered on its own merits" to determine whether modifications were objectively and reasonably foreseeable. *Chairez*, 215 P.3d at 740. If "reasonable minds can differ on this issue, it is for the jury to determine these factual questions concerning the nature of the modifications, their relationship to each other, causation, and foreseeability." *Id.* at 738. The New Mexico courts have refused to set forth a blanket rule that summary judgment will never be appropriate in a modification context. *Id.* at 740 (refusing to express "a blanket rule that summary judgment will never be appropriate in this context"). Courts may decide "as a matter of law [whether] the use to which the product was put was so unintended and unforeseeable that the case [may be decided on summary judgment]." *Van de Valde v. Volvo of Am. Corp.*, 744 P.2d 930, 931 (N.M. Ct. App. 1987).

- 15 -

Similarly, a claim of negligence under New Mexico law also "encompasses the concepts of foreseeability of harm to the person injured and of a duty of care toward that person." *Herrera v. Quality Pontiac*, 73 P.3d 181, 186 (N.M. 2003) (quotations omitted). A "supplier must use ordinary care to warn of a risk of injury. However, there is no duty to warn of a risk unknown to the supplier, unless . . . the supplier should have known of the risk." N.M. Civ. UJI 13-1415. "Where an injury is caused by a risk or a misuse of the product which was not reasonably foreseeable to the manufacturer and supplier, they are not liable." *Smith ex rel. Smith v. Bryco Arms*, 33 P.3d 638, 645 (N.M. Ct. App. 2001).

B.      Foreseeability --  United's Modifications to the Lift

JLG designed, manufactured and sold a scissor lift with an interlock device to prevent the leveling jacks from moving, once they were set, if the work platform was raised more than six inches. In addition, it cautioned, in numerous places and ways, not to modify the lift without its prior approval and specifically warned that any such modification might result in serious injury or death. Thus, as the district court put it, the question is "whether it was reasonably foreseeable to . . . JLG that someone would disobey the manufacturer's directions, extensively modify the scissor lift without its knowledge or consent so as to bypass the interlock device, and then use the lift in such a modified condition without any warning that the equipment had been modified." (Appellants' Appx. at 391.) The district court concluded: "The undisputed facts concerning the extent of the post-sale modifications to the scissor lift and the disregard of existing warnings and directions supplied by . . . JLG support the inference that the risks

- 16 -

entailed by these post-sale modifications were not reasonably foreseeable to . . . JLG as a matter of law." (*Id.* at 393.)

Appellants dedicate the majority of their brief to arguments addressing the nuances of New Mexico law on the issues of causation, contribution, comparative fault and intervening cause. While these issues are important, so is context - their applicability depends on foreseeability. For example, the district court referenced New Mexico's Civil Uniform Jury Instruction 13-1424 which states:

> The cause of an injury is that which, in a natural and continuous sequence [unbroken by any independent intervening cause], contributes to bringing about the injury and without which the injury would not have occurred. [It need not be the only cause, nor the last nor nearest cause. It is sufficient if it occurs with some other cause, acting at the same time, which, in combination with it, causes the injury.]
>
> ["Independent intervening cause" is that which interrupts the natural sequence of events which could reasonably be expected to result from the condition in which a product was sold or from a foreseeable manner of use. An independent intervening cause *unforeseeably* turns aside the course of events and produces a result which *could not reasonably have been expected*.]

(Emphasis added). The court's discussion related solely to the concept of foreseeability as a necessary element of liability and the lack of foreseeability as the lynchpin of its decision.[17]

---

[17] The district court also addressed New Mexico's Civil Uniform Jury Instruction 13-1402, which requires suppliers to avoid foreseeable risks of injuries to users of its products, and Civil Uniform Jury Instruction 13-1425, which requires adequate warnings to reasonably foreseeable users disclosing the nature and extent of a danger not covered by a general warning or simple directive to use or not to use the product in a certain way. It also considered the Restatement (Third) of Torts and a number of cases which all discuss manufacturer liability for foreseeable uses and foreseeable injuries.

According to Appellants, JLG should have foreseen that "Ramos [would] believe[]" he was restoring the 500RTS to its original condition [because] he tried to match the wiring in JLG's schematic[18] . . . [and he would] not view this repair as an alteration or modification of the machine, and would not have considered written consent from JLG to be required." (Appellants' Opening Br. at 28-29.) And, thus, it should have warned about such a possibility. "A test of foreseeability, however, does not bring within the scope of a defendant's liability every injury that might possibly occur." *Van de Valde*, 744 P.2d at 932 (quotations omitted). The New Mexico Supreme Court has defined foreseeability "as that which is *objectively reasonable* to expect, not merely what might conceivably occur." *Id.* (quotations omitted).

As the district court noted, there was no evidence other owners or users had made substantial modifications to the DSCOS, particularly without contacting JLG. Certainly no rational trier of fact could reasonably conclude JLG should foresee a mechanic might create new power sources; cut, splice, add and reconnect wires to new pins and connectors; and disconnect a light designed to illuminate when the leveling jacks were set yet still believe such acts would not amount to a modification or alteration to the lift.[19] Indeed, there was no evidence suggesting JLG had any reason to contemplate Ramos's

---

[18] The wiring schematic showed the connection between the DSCOS and the leveling jack switches.

[19] Appellants conceded at oral argument that the bypass caused by Ramos's rewiring was the sole cause of the leveling jack retraction. They admitted that without Ramos's modifications, the interlock device would have prevented the leveling jack retraction, and thus the injuries sustained when the lift tipped over.

improvident undertakings would even be attempted. Thus, JLG could not reasonably foresee why additional warnings were needed.

Appellants stressed at oral argument "all kinds of things" could have stopped the DSCOS from operating properly, including "debris . . . [or] low temperatures." (Oral Argument Recording at 30:44-30:50.) Such possibilities, they assert, created an unreasonable risk of injury for which an adequate warning should have been given. While it may be plausible that ice or debris would interfere with the DSCOS, those are not the facts presented in this case. The foreseeability of other possible causes must wait. *See Kunkel v. Cont'l Cas. Co.*, 866 F.2d 1269, 1274 (10th Cir. 1989) ("'Advance expressions of legal judgment upon issues which remain unfocused' are impermissible.") (quoting *United States v. Fruehauf,* 365 U.S. 146, 157 (1961)).

Under the facts presented here, it was unforeseeable that unreported modifications would bypass the interlock to the leveling jacks and remove that integrated safety mechanism which otherwise alerted users (by cutting out the high-speed functions and their attending noise) the lift was unsafe to operate. The modifications caused the lift to function in a way unintended and unexpected by JLG. The malfunction of the leveling jack cut out switch was unforeseeable as a matter of law and, therefore, JLG had no reason to require or recommend more comprehensive operational tests to disclose such a possibility. Accordingly, we affirm the district court's grant of summary judgment in favor of JLG on all claims.

C.    Remaining Issues

Given our conclusion that JLG is not liable under either strict liability or

negligence theories, Appellants' motion for partial summary judgment must fail.  In addition, Magoffe's affidavit, even if admissible would not change the result as JLG had no duty to provide additional warnings.  In any event, his statement that a hypothetical warning would have prevented the accident is inadmissible.  Because Magoffe is not an expert witness, his statements must be rationally based on his perceptions and helpful to the determination of a material fact.  Fed. R. Evid. 701.  "The perception requirement stems from [Rule 602 of the Federal Rules of Evidence]  which requires a lay witness to have first-hand knowledge of the events he is testifying about so as to present only the most accurate information to the finder of fact."  *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 667 n.12 (10th Cir. 2006) (quotations omitted); *see also Gossett v. Okla. ex. rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1179 (10th Cir. 2001) (holding an affidavit of a lay witness, an instructor at the university, admissible in a gender discrimination case because she "observe[d] firsthand for several years the School's policies and practices with respect to its treatment of male students.  Her opinion . . . convey[ed] her impression based on what she had herself perceived.").  Magoffe's speculation as to what he would have done is not based on his first-hand perception of actual events.

**AFFIRMED**.  Appellants' motion to certify questions to the New Mexico Supreme Court is **DENIED**.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge