Filed 5/22/24

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| NATHAN K. WILLIAMS,<br><br>        Plaintiff and Respondent,<br>v.<br><br>J-M MANUFACTURING COMPANY, INC.,<br><br>        Defendant and Appellant. | A162561, A163492<br><br>(Alameda County<br>Super. Ct. No. RG19032329) |

Before he died from mesothelioma during the pendency of this appeal, Cornelius Williams filed a complaint for personal injury based on his secondary exposure to asbestos from his brother Nathan's work with asbestos-cement pipe over more than 20 years. Cornelius and Nathan did not live together, but had regular close contact during Nathan's employment. One of the entities Cornelius sued was J-M Manufacturing Company, Inc. (J-MM), a supplier of asbestos-cement pipe to Nathan's workplaces.

Cornelius's strict liability cause of action, based on theories of design defect and failure to warn, went to verdict. The jury found liability under both theories, concluding that Cornelius had proven he was exposed to

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II and III of the Discussion.

1

asbestos, and that the pipe sold by J-MM was a substantial factor in increasing his risk of developing cancer.

J-MM raises three arguments in this appeal. First, J-MM argues it was entitled to judgment because, as a matter of law, strict liability does not apply in favor of Cornelius, a non-household member of his brother, under our Supreme Court's decision in *Kesner v. Superior Court* (2016) 1 Cal.5th 1132 (*Kesner*). *Kesner*, a negligence case, held that employers and premises owners owe a duty of care to prevent secondary exposure to asbestos carried by the bodies and clothing of on-site workers, but that the duty extends only to members of a worker's household. (*Id*. at p. 1140.) J-MM argues that *Kesner's* limitation on the duty of care for claims based on negligence should be applied to strict liability claims against suppliers or sellers of asbestos products. Second, J-MM argues the judgment must be reversed because there was no substantial evidence that Cornelius was exposed to asbestos from pipe supplied by J-MM (rather than another supplier). Third, J-MM argues in the alternative that even if it is not entitled to a defense judgment, it is entitled to a new trial because the court abused its discretion in excluding certain exhibits from trial. We affirm.

## BACKGROUND

Cornelius filed a complaint for personal injury against J-MM and several other defendants. Among other things, Cornelius asserted causes of action for negligence and strict liability, alleging he had been exposed to asbestos because Nathan "frequently and regularly worked with" asbestos-cement pipe manufactured, sold, supplied, and distributed by defendants while he was working for the East Bay Municipal Utilities District (EBMUD) from 1978 to 1988, and for Daly City from 1989 to 2011.

2

The negligence and strict liability causes of action proceeded to trial against only two defendants:  J-MM and A.H. Voss Company (Voss).  Voss sold asbestos-cement pipe manufactured by Kubota from 1962 to 1975.  J-MM sold asbestos-cement pipe from 1983 to 1988, after acquiring the assets of Johns-Manville's domestic asbestos-cement pipe business.[1]

At the close of presentation of evidence, J-MM and Voss filed motions for directed verdict.  J-MM asked the trial court to grant a directed verdict on the issue of duty, relying on *Kesner*, where the California Supreme Court had limited an employer or property owner's duty of care for negligence causes of action premised on secondary exposure to asbestos to members of an employee's household.  J-MM argued that the trial court should "similarly find that J-MM owes no legal duty" to Cornelius, because he was not a member of Nathan's household during the alleged secondary exposure to asbestos.

The trial court dismissed the negligence cause of action, but not the strict liability cause of action.  It explained:  "With regard to the application of the *Kesner* case, to this case, the argument does have merit.  But only part of the way home.  [¶] The *Kesner* case neither says that it does not apply to product liability cases or to strict liability cases, nor does it say that it does apply to strict liability cases."

The jury found in favor of Cornelius on his remaining strict liability cause of action, awarding him $556,700 in economic damages and $2.14

---

[1] Johns-Manville was a global leader in the manufacturing of asbestos-containing products.  After Johns-Manville declared bankruptcy in 1982, its asbestos-cement pipe business was purchased by two companies that began operations on January 1, 1983:  J-M A/C Pipe Corporation (J-M A/C), which manufactured asbestos-cement pipe, and J-MM, which sold asbestos-cement pipe that J-M A/C manufactured.

million in non-economic damages.  It apportioned 50 percent responsibility to J-MM, 20 percent to Voss, 10 percent to Johns-Manville, and 20 percent to other manufacturers.

J-MM moved for judgment notwithstanding the verdict (JNOV) and, in the alternative, for a new trial, arguing that the trial court erred in its interpretation and application of *Kesner* to preclude only the negligence cause of action.  The motion was denied.  J-MM also moved to tax costs claimed by Cornelius.

J-MM appealed from the judgment and order denying its motion for JNOV, as well as the order on its motion to tax costs.  The appeals were consolidated.[2]  Voss also appealed, but subsequently notified this court that the parties were settling the matter and  abandoned the appeal.  After Cornelius's death, Nathan was substituted as his successor-in-interest.

## DISCUSSION

J-MM challenges the judgment on Cornelius's strict liability cause of action in three respects.  J-MM argues that (1) judgment must be entered in its favor because, under *Kesner*, strict liability does not apply to Cornelius; (2) the judgment must be reversed for lack of substantial evidence; or (3) a new trial is necessary because the trial court abused its discretion on certain evidentiary rulings.  We address, and reject, each argument in turn.

---

[2] The court ordered that J-MM was severally liable for $166,465.52 of Cornelius's expert costs and fees, and jointly and severally liable with Voss for the $139,079.34 remainder of Cornelius's costs.  J-MM appears to have abandoned its appeal from the order on its motion to tax costs, and we do not address the issue further.

4

## I. Strict Liability

### A. *Framework and Standard of Review*

We begin with the general framework for understanding Cornelius's strict liability cause of action and the legal question presented in this appeal. California law recognizes strict liability as a theory under which plaintiffs may claim they were harmed by a defective product. (*Webb v. Superior Court* (2016) 63 Cal.4th 167, 181.) Strict liability can be asserted not only against the manufacturer of defective products, but also against distributors or sellers of defective products. (*O'Neil v. Crane Co.* (2012) 53 Cal.4th 335, 342 ["California law has long provided that manufacturers, distributors, and retailers have a duty to ensure the safety of their products and will be held strictly liable for injuries caused by a defect in their products"].) Here, Cornelius asserted a strict liability cause of action against J-MM for selling asbestos-cement pipe.

Strict liability may be invoked to allege three types of product defects: (1) manufacturing defects, (2) design defects, and (3) warning defects. (*Webb*, *supra*, 63 Cal.4th at p. 180.) "Manufacturing defects can arise, for example, when a flaw in the manufacturing process creates a product that differs from what the manufacturer intended." (*Ibid.*) "Design defects appear in products that, although properly manufactured, are dangerous because they lack a critical feature needed to ensure safe use." (*Ibid.*) Warning defects render a product " 'dangerous because it lacks adequate warnings or instructions.' " (*Ibid.*) Plaintiffs alleging product liability claims "often allege both design and warning defects." (*Id.* at p. 181.) That is what happened in this case; Cornelius alleged that asbestos-cement pipe sold by J-MM had *both* design and warning defects.

5

For an alleged design defect, there are two alternative tests to prove liability: the consumer expectations test and the risk-benefit test. (*Webb, supra*, 63 Cal.4th at p. 180.) Here, Cornelius sought liability on his design defect claim under the consumer expectations test. To satisfy this test, Cornelius was required to prove that J-MM's asbestos-cement pipe "fail[ed] to perform as safely as an ordinary consumer would expect" when used or misused in an intended or foreseeable way, and that the failure of the pipe to perform safely was a substantial factor in causing Cornelius's harm. (*Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 418; see also CACI No. 1203.)

To establish his alleged warning defect claim, Cornelius was required to prove that J-MM's asbestos-cement pipe had potential risks known or "knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution," that those potential risks presented substantial danger when the pipe was used or misused in an intended or reasonably foreseeable way, that ordinary consumers would not have recognized those potential risks, that J-MM failed to adequately warn of those potential risks, and that the lack of sufficient warning was a substantial factor in causing Cornelius's harm. (*Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 1002, 993, fn. 5; see also CACI No. 1203.)

The judgment on special verdict makes clear that the jury concluded Cornelius had proven both that asbestos-cement pipe sold by J-MM had a design defect (under the consumer expectations test) and a warning defect to support his strict liability cause of action.

J-MM's subsequent motion for JNOV raised the same question of law presented in its motion for directed verdict: whether *Kesner* precluded Cornelius's strict liability cause of action. Our review is de novo. (*Sweatman*

6

*v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68 [sole question of law on denial of motion for JNOV subject to de novo review].)  Neither party has cited any authority that directly answers the question.

### B. *Kesner*

In *Kesner*, our Supreme Court granted review and consolidated two cases involving liability for secondary exposure to asbestos.  (*Kesner*, *supra*, 1 Cal.5th at p. 1140.)  The plaintiff in the first case (Kesner) claimed negligence through his alleged secondary exposure from his uncle's work at a manufacturing plant.  (*Id.* at pp. 1141–1142.)  The trial court granted a motion for non-suit on the ground that the manufacturing plant (Abex) had no duty to protect family members of its workers from secondary exposure to asbestos.  The appellate court reversed.  (*Id.* at p. 1142.)  The plaintiffs in the second case (the Havers) claimed premises liability against BNSF Railway Company (BNSF), alleging secondary exposure from an employee to his wife.  (*Id.* at p. 1141.)  The trial court sustained BNSF's demurrer based on lack of duty to household members who suffer secondary exposure to asbestos, and the appellate court affirmed.  (*Id.* at p. 1142.)  The nonsuit motion filed by Kesner and the demurrer filed by the Havers were both based on the then-leading case on whether defendants owed a duty of care to prevent take-home or secondary asbestos exposure under California law, *Campbell v. Ford Motor Co.* (2012) 206 Cal.App.4th 15.  (4 Cetrulo, Toxic Torts Litigation Guide (2023) § 42-A.)  In *Campbell*, the Second District reversed a judgment for a plaintiff, diagnosed with mesothelioma, who had asserted a premises liability claim from secondary exposure to asbestos through laundering her father and brother's clothing.  (*Campbell* at p. 19.)  *Campbell* held that "a property owner has no duty to protect family members of workers on its premises from

7

secondary exposure to asbestos used during the course of the property owner's business." (*Id.* at p. 34.)

Describing the different conclusions as to liability reached by the lower courts for Kesner and the Havers, our Supreme Court granted review "to determine whether an employer has a duty to members of an employee's household to prevent take-home asbestos exposure on a premises liability or negligence theory." (*Kesner, supra,* 1 Cal.5th at p. 1142.) *Kesner* explained that both theories of liability—negligence (based on the employer's alleged failure to prevent employees from exposing others) and premises liability (based on the employer's alleged failure to prevent exposure as owner of the property where employees work)—require the element of duty. (*Id.* at p. 1158.) Accordingly, the scope of review in *Kesner* was clear: "Here we are tasked solely with deciding whether [defendants] had a legal duty to prevent the injuries alleged by [plaintiffs]." (*Id.* at p. 1142.) As we describe below, the court reached a conclusion about the scope of this duty and explicitly disapproved *Campbell.* (*Kesner,* at p. 1156.)

"The 'general rule' of duty in California is established by statute." (*Kuciemba v. Victory Woodworks, Inc.* (2023) 14 Cal.5th 993, 1016 (*Kuciemba*).) Civil Code section 1714, subdivision (a) " 'establishes the default rule that each person has a duty "to exercise, in his or her activities, reasonable care for the safety of others." ' " (*Kuciemba,* at p. 1016.) While section 1714 states the general default rule, exceptions can be created by statute or by courts " 'only where "clearly supported by public policy." ' " (*Kesner, supra,* 1 Cal.5th at p. 1143.) These policy considerations must be clear in order to justify " 'carving out an entire category of cases from that general duty rule.' " (*Id.* at pp. 1143–1144.)

8

To determine whether public policy supports such an exception, courts look to the seven factors set forth in *Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*): foreseeability of injury, certainty that plaintiff suffered injury, connection between injury and defendant's conduct, moral blame, preventing future harm, burden to defendant and the community, and availability of insurance. (*Kesner*, *supra*, 1 Cal.5th at p. 1143.) The *Rowland* factors fall into two categories: the first three consider "the foreseeability of the relevant injury," and the others "take into account public policy concerns that might support excluding certain kinds of plaintiffs or injuries from relief." (*Kesner*, at p. 1145.) The court in *Kesner* explained that foreseeability of injury was "[t]he most important factor," measured by what a " ' "reasonably thoughtful [person] would take account of . . . in guiding practical conduct." ' " (*Id.* at p. 1145.)

*Kesner* thus analyzed the seven *Rowland* factors to decide whether an employer owes a duty of care to protect an employee's household members from secondary exposure to asbestos. (*Kesner*, *supra*, 1 Cal.5th at pp. 1145–1152.) It determined that the first three factors weighed in favor of finding a duty because "it was foreseeable that people who work with or around asbestos may carry asbestos fibers home with them and expose members of their household," it was certain that the plaintiffs had suffered injury because they had died of mesothelioma, and the purported intervening conduct (workers returning home without adequate precautions and bringing in asbestos dust) was "predictive and derivative of the alleged misconduct" and thus "entirely foreseeable." (*Id.* at pp. 1145, 1148–1149.)

The court then turned to the consideration of the remaining *Rowland* factors. It had little difficulty finding that "[n]egligence in [commercial users] use of asbestos is morally blameworthy," legislatures and agencies had

9

"readily adopted the premise" that imposing liability for asbestos exposure would prevent future harm, protection of household members would not impose a greater burden than the protection of workers themselves, and that the relevant framework for availability of insurance looks to the time of exposure. (*Kesner, supra*, 1 Cal.5th at p. 1151.)

But *Kesner* also described defendants' argument on burden as their "most forceful contention." (*Kesner, supra*, 1 Cal.5th at p. 1153.) Defendants' "legitimate concerns regarding the unmanageability of claims premised upon incidental exposure, as in a restaurant or city bus . . . point to the need for a limitation on the scope of the duty here." (*Id.* at p. 1154.) *Kesner* thus held that "an employer's or property owner's duty to prevent take-home exposure extends only to members of a worker's household, i.e., persons who live with the worker and are thus foreseeably in close and sustained contact with the worker over a significant period of time." (*Id.* at pp. 1154–1155.)

The court explained that this limitation was consistent with its analysis under the *Rowland* factors: "Our finding of foreseeability turned on the fact that a worker can be expected to return home each workday and to have close contact with household members on a regular basis over many years. Persons whose contact with the worker is more incidental, sporadic, or transitory do not, as a class, share the same characteristics as household members and are therefore not within the scope of the duty we identify here. This rule strikes a workable balance between ensuring that reasonably foreseeable injuries are compensated and protecting courts and defendants from the costs associated with litigation of disproportionately meritless claims." (*Kesner, supra*, 1 Cal.5th at p. 1155.) Accordingly, *Kesner* held that "defendants owed the members of their employees' households a duty of

10

ordinary care to prevent take-home exposure and that this duty extends no further." (*Id.* at p. 1156.)

Here, J-MM argues that this holding in *Kesner* foreclosed Cornelius's strict liability cause of action as a matter of law because he was not a household member of his brother Nathan. We disagree. The plaintiffs in *Kesner* alleged negligence and premises liability claims, both of which include the element of duty. (*Kesner, supra*, 1 Cal.5th at p. 1158.) Our Supreme Court made clear that it was deciding the scope of that duty owed under these legal theories. (*Id*. at p. 1142.) Unlike the claims in *Kesner*, Cornelius's strict liability cause of action did not require him to prove any element of duty. "[S]trict products liability causes of action need not be pled in terms of classic negligence elements (duty, breach, causation and damages)." (*Elsheref v. Applied Materials, Inc.* (2014) 223 Cal.App.4th 451, 464.) "Unlike a negligence theory of liability, a strict products liability theory does not focus on the defendant's duty to use due care; the defendant's behavior is irrelevant." (*Jenkins v. T&N PLC* (1996) 45 Cal.App.4th 1224, 1231.)

J-MM relies on *Kesner* and other decisions that have "followed *Kesner's* bright line," but tiptoes around the reality that these are all *negligence* cases. There is no doubt that *Kesner* has been followed by courts to determine the scope of duty for negligence claims. (E.g., *Kuciemba, supra*, 14 Cal.5th at p. 1004 [employer did not owe duty of care to prevent spread of COVID-19 to employee's household members given "intolerable burden on employers and society in contravention of public policy"]; *Petitpas v. Ford Motor Co.* (2017) 13 Cal.App.5th 261, 276 [oil company did not have duty to non-household member to prevent alleged secondary asbestos exposure].) Indeed, the trial court here correctly dismissed Cornelius's negligence claim on this basis (an issue not challenged on appeal). J-MM, however, does not present any

11

authority concluding that the limitation on duty in *Kesner* summarily precludes a strict liability cause of action asserted by a non-household member alleging secondary exposure to asbestos like Cornelius.

### C. *Strict Liability vs. Negligence*

J-MM argues next that, even if *Kesner* did not address strict liability, it should still apply to foreclose Cornelius's claim as a matter of law because strict liability and negligence are shaped by the same elements and underlying policy considerations.

As for the elements of the two causes of action, J-MM relies heavily on *Romito v. Red Plastic Co.* (1995) 38 Cal.App.4th 59 (*Romito*). In that case, family members of an electrician brought negligence and strict liability claims against a manufacturer of plastic skylights. (*Id.* at p. 63.) The electrician suffered a fatal injury after stumbling and falling through a skylight to the concrete floor below while removing cable and wires on a roof without wearing a safety line. (*Ibid.*) The appellate court affirmed summary judgment on the negligence claim upon concluding that the skylight manufacturer had no duty to protect the electrician against his unforeseeable and accidental misuse of the skylight. (*Id.* at p. 69.) It then affirmed summary judgment on the strict liability claim because plaintiffs could not show the defect element: failure to perform when the skylight was used or misused in an intended or foreseeable way. (*Id.* at p. 70.)

The appellate court's analysis thus concerned whether the *use or misuse* of the skylight was foreseeable. (*Romito, supra*, 38 Cal.App.4th at pp. 69–70.) We agree that this concept of foreseeability is involved in strict liability. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 560 ["A manufacturer, distributor, or retailer is liable in tort if a defect in the manufacture or design of its product causes injury while the product is being

12

used in a reasonably foreseeable way"]; *Milwaukee Electric Tool Corp. v. Superior Court* (1993) 15 Cal.App.4th 547, 558 ["Even if an injured plaintiff's acts constituted misuse of a product, if those acts were foreseeable, strict liability may still apply"].)  For his design defect claim under the consumer expectations test,[3] Cornelius had to prove that the J-MM pipe did not perform as safely as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way.  (*Barker v. Lull Engineering Co.*, *supra*, 20 Cal.3d at p. 418.)  And for his warning defect claim, Cornelius had to prove the J-MM pipe had potential risks that ordinary consumers would not have recognized and that presented substantial danger when the pipe was used or misused in an intended or reasonably foreseeable way.  (*Anderson v. Owens-Corning Fiberglas Corp.*, *supra*, 53 Cal.3d at p. 993, fn. 5.)

This focus on the foreseeability of use is consistent with the broader objectives of strict liability to create incentives that "achieve optimal levels of safety in designing and marketing products."  (Rest.3d Torts, § 2, com. (a); *Daly v. General Motors Corp.* (1978) 20 Cal.3d 725, 746 (*Daly*) [explaining "products must incorporate and balance safety, utility, competitive merit, and practicality *under a multitude of intended and foreseeable uses*"].) "[C]onsumer expectations about product performance and the dangers attendant to product use affect how risks are perceived and relate to foreseeability and frequency of the risks of harm."  (Rest.3d Torts, § 2, com. (g).)  We see nothing in these elements that categorically excludes a plaintiff

_____

[3] Given it does not appear that Cornelius sought to prove liability at trial under the alternative risk-benefit test and the two design defect tests "do not serve as defenses to one another" (*Chavez v. Glock, Inc.* (2012) 207 Cal.App.4th 1283, 1303), we do not address the foreseeability element of the risk-benefit test.

13

like Cornelius from seeking to prove his claims that J-MM's asbestos-cement pipe defied consumer expectations and failed to provide adequate warnings when used in a foreseeable way.

*Romito*'s reliance on the same underlying premise (unforeseeable and accidental misuse) in its analysis of both (1) the duty element in negligence and (2) the defect element in strict liability, however, does not support J-MM's position these two causes of action "meld" together. Indeed, *Gilead Tenofovir Cases* (2024) 98 Cal.App.5th 911, review granted May 1, 2024, S283862 (*Gilead*) recently rejected this position. The issue in *Gilead* was whether the plaintiffs were foreclosed from a negligence claim by alleging that the manufacturer negligently deferred development of a new medication with lower risk of adverse effects, and not attempting to prove that the older medication was itself defective. (*Id.* at pp. 916–917.) The appellate court determined the plaintiffs were not so foreclosed, explaining that the requirement to prove a product defect is "necessary to constrain the reach of strict liability" but for negligence claims, "the requirement of a duty of care imposes its own limits on the potential scope of liability, governed by an array of policy considerations as they bear on a particular context." (*Id.* at p. 924.) The court noted that the limitations of negligence claims prompted the development of the strict liability doctrine. (*Id.* at p. 923.) *Gilead* concluded: "In our view, neither logic nor jurisprudential history compels the conclusion that the two concepts must be coextensive in every case in which a plaintiff is injured by a product." (*Id.* at p. 924.)

J-MM also relies on *Lambert v. General Motors* (1998) 67 Cal.App.4th 1179 to argue that Cornelius's strict liability and negligence causes of action "merged." In *Lambert*, a plaintiff injured in a car accident asserted product liability claims based on theories of strict liability (defects in roof and seatbelt

14

design of car) and negligence (manufacturer was negligent in design of car). (*Id.* at pp. 1181–1182.) The jury concluded there was no defect, but that the car manufacturer was negligent in the design of the car. (*Id.* at p. 1182.) The appellate court determined that the verdict was inconsistent and remanded for a new trial. (*Id.* at p. 1186.) It reasoned that the manufacturer could not be negligent for design if there was no design defect. (*Ibid.*) It explained that, because both product liability claims depended on proof of the defect, the claims "merge." (*Id.* at p. 1185.) But nothing in *Lambert* suggests that the element of *duty* in any negligence cause of action merges or is coextensive with the defect element in a strict liability cause of action.

As for the policy considerations underlying the two causes of action, we again acknowledge the general premise that both doctrines balance the costs and benefits of liability. (*Kesner, supra*, 1 Cal.5th at p. 1143; *Daly, supra*, 20 Cal.3d at p. 746.) But these policy considerations are not identical, and in any event do not support the inexorable extension of *Kesner* that J-MM advances here as a matter of law.

Strict liability was developed to ensure that costs from defective products are borne by manufacturers, retailers, and distributors who put the products into the stream of commerce (and who can then adjust for those associated costs in the course of their business), not individuals " 'who are powerless to protect themselves' " from those defects. (*Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578, 585 (*Elmore*).) As described above, the foreseeability element of Cornelius's strict liability claims informs this balancing. Individuals appropriately bear the costs when the product is being used in an *unforeseeable* way. (See, e.g., *Daly, supra*, 20 Cal.3d at p. 733 ["[T]he manufacturer is not deemed responsible when injury results from an unforeseeable use of its product"].) Individuals also appropriately bear

15

the costs for failures or potential risks that are reasonably expected even with foreseeable use. If a product is inherently or obviously dangerous, for example, a reasonable consumer would have related expectations about performance and potential risks. But protecting individuals from unexpected defects arising from foreseeable use of a protect is consistent with that goal.

Nor are we persuaded by J-MM's other "policy" reasons to extend *Kesner*. First, J-MM suggests that declining to do so would improperly equate strict liability with "absolute liability." Not so. "[S]trict liability has never been, and is not now, *absolute* liability." (*Daly*, *supra*, 20 Cal.3d at p. 733.) "On the contrary, the plaintiff's injury must have been caused by a 'defect' in the product." (*Ibid.*) "Furthermore, we have recognized that though most forms of contributory negligence do not constitute a defense to a strict products liability action, plaintiff's negligence is a complete defense when it comprises assumption of risk." (*Ibid.*) As *Daly* makes clear, the elements for (and defenses to) a strict liability cause of action prevent it from imposing absolute liability. Cornelius was still required to prove the J-MM pipe did not perform as safely as an ordinary consumer would have expected it to perform and had failures or risks when used in a foreseeable way.

Second, J-MM argues that declining to extend *Kesner* to strict liability causes of action would be "perverse" because product defendants would "shoulder all the blame" with no means of warning individuals like Cornelius. But employers and premises owners are still potentially liable under negligence theories for asbestos exposure to workers and household members under *Kesner* and, as described above, non-household members alleging secondary exposure to asbestos must still *prove* the elements of strict liability to proceed under that theory against product defendants. Moreover, J-MM's argument assumes that it was found liable based on failure to warn

16

*Cornelius*. The record does not support this assumption. It was Nathan who testified that he never saw any warnings on the asbestos-cement pipe he worked on. The jury verdict found only that J-MM (and Voss) had "failed to adequately warn of the potential risks of asbestos-cement pipe."

Third, J-MM warns that allowing non-household members to pursue strict liability causes of action for secondary exposure to asbestos would result in "virtually infinite litigation" and lead to consumers being "swamped with ineffectual warnings." But, as explained above, the elements of strict liability provide guardrails for such litigation. (*Daly*, *supra*, 20 Cal.3d at p. 734.) Nor does J-MM explain how correction of the warning defect alleged here (no warning on asbestos-cement pipe) would diminish the efficacy of consumer warnings as a whole.

### D. *Bystander Recovery*

Finally, J-MM argues that allowing a plaintiff like Cornelius to proceed with a strict liability cause of action would "ignore the limits" placed on bystander recovery by the California Supreme Court. For the reasons we described above in part I.B., we reject this argument to the extent it relies on expanding *Kesner's* holding on duty in negligence causes of action to foreclose strict liability causes of action, which require no element of duty.

J-MM also cites authority regarding bystander recovery on claims for negligent infliction of emotional distress (NIED) to support this argument, specifically *Fortman v. Förvaltningsbolaget Insulan AB* (2013) 212 Cal.App.4th 830. That case provides no support for J-MM. In *Fortman*, the plaintiff asserted a NIED claim after witnessing the death of her brother while they were scuba diving. (*Id.* at p. 832.) The plaintiff thought her brother had suffered a heart attack, but later learned his death was caused by a component of his scuba equipment that prevented him from getting

enough air. (*Ibid.*) Citing *Thing v. La Chusa* (1989) 48 Cal.3d 644, the appellate court explained that the plaintiff did not have a viable bystander NIED claim because she could not meet one of the required elements: that she was "present and contemporaneously perceived the causal connection between the accident and the injuries suffered." (*Fortman*, at p. 832.) Plaintiff argued that this element should not apply to cases, such as hers, when a close relative sustains a "product-related injury where strict liability principles apply." (*Id.* at p. 841.) The court in *Fortman* rejected that argument, doing precisely what we do here: declining to apply elements and policy considerations underlying one type of action (negligence) to alter those in another type of action (strict liability). (*Id.* at pp. 844–845.)

Instead, we find *Elmore* instructive on the scope of bystander recovery under California law. In that case, the drive shaft of a Rambler American station wagon became disconnected, causing the car to fishtail out of control, cross over to the other side of the road, and strike the vehicle of plaintiff/bystander Waters with such impact that the driver was hurled from the Rambler onto an embankment. (*Elmore*, *supra*, 70 Cal.2d at pp. 580–581.) In the subsequent consolidated personal injury and wrongful death actions, the trial court granted American Motors Corporation and the automobile dealer's motions for nonsuit. (*Id.* at p. 580.) Our Supreme Court reversed the judgment. (*Id.* at p. 587.)

The question presented in *Elmore* was "whether the doctrine of strict liability of the manufacturer and retailer for defects is applicable to third parties who are bystanders and who are not purchasers or users of the defective chattel." (*Elmore*, *supra*, 70 Cal.2d at p. 585.) At the time *Elmore* was decided, "no case had applied strict liability to a person who was not a user or consumer." (*Ibid.*) But other California Supreme Court cases had

made clear that strict liability "may not be restricted on a theory of privity of contract." (*Id.* at p. 586.) Instead, "liability has been based upon the existence of a defective product which caused injury to a human being, and . . . we did not limit the rules stated to consumers and users but instead used language applicable to human beings generally." (*Ibid.*) *Elmore* concluded: "If anything, bystanders should be entitled to greater protection than the consumer or user where injury to bystanders from the defect is reasonably foreseeable. Consumers and users, at least, have the opportunity to inspect for defects and to limit their purchases to articles manufactured by reputable manufacturers and sold by reputable retailers, whereas the bystander ordinarily has no such opportunities. In short, the bystander is in greater need of protection from defective products which are dangerous, and if any distinction should be made between bystanders and users, it should be made, contrary to the position of defendants, to extend greater liability in favor of the bystanders." (*Id.* at p. 586.)

Our conclusion is entirely consistent with the directive in *Elmore* to err on the side of greater protection for bystanders who are " 'powerless to protect themselves' " from those defects.[4] (*Elmore*, *supra*, 70 Cal.2d at p. 585.)

---

[4] Cases cited by J-MM and amici curiae on bystander recovery under other state laws are not binding on this court or our interpretation of California law. (See *Episcopal Church Cases* (2009) 45 Cal.4th 467, 490.) Nor do we find them persuasive. *Martin v. Cincinnati Gas and Elec. Co.* (6th Cir. 2009) 561 F.3d 439, for example, relies on Kentucky law that is contrary to the broader conception of bystander recovery set forth in *Elmore*. (*Id.* at pp. 446–447.) *Rohrbaugh v. Owens-Corning Fiberglas Corp.* (10th Cir. 1992) 965 F.2d 844 involves concepts in negligence: specifically, the scope of a manufacturer's duty to warn under Oklahoma law. (*Id.* at p. 846.) *Magoffe v. JLG Industries, Inc.* (10th Cir. 2010) 375 Fed.Appx. 848 is also inapposite; it explains that strict liability for product defects may be limited by

19

Moreover, the foreseeability element of Cornelius's design and warning defect claims captures the concept of foreseeability described in *Elmore*, as Cornelius was required to prove that J-MM's asbestos-cement pipe failed in a manner that defied consumer expectations and lacked adequate warnings when used in a foreseeable way.

In sum, we decline to extend *Kesner*'s limitation on duty for negligence causes of action alleging secondary exposure to asbestos to Cornelius's strict liability cause of action here. The trial court did not err in denying J-MM's motion for JNOV.

## II. *Substantial Evidence*

### A. *Additional Background*

Nathan worked for EBMUD from 1978 to 1988. J-MM supplied 624 tons of asbestos-cement pipe to EBMUD. Nathan testified that he worked on water mains and service lines, including asbestos-cement pipe. He performed pipe repairs, pipe drilling, pipe removal, valve replacements, and "hydro installations" on asbestos-cement pipe. He saw breakage of asbestos-cement pipe caused by various factors, including age, backhoes, service saddles, high water pressure, and earthquakes. He agreed that, generally speaking, older pipe was more likely to be damaged than new pipe. An EBMUD witness testified that age factored in "a little" on asbestos-cement pipe breakage, but that age "wasn't as often" the cause "as the other reasons" because asbestos-cement pipe is "strong" and "sturdy."

Nathan testified that his work involved not only damaged asbestos-cement pipe, but cutting or drilling into pipe for other reasons (e.g. to replace

unforeseeable *modification* of a product under New Mexico law. (*Id.* at p. 850.)

20

or repair fittings and fixtures), including pipe that had been installed only six months prior.

Nathan testified that he worked on four types of asbestos-cement pipe while at EBMUD: J-MM, Johns-Manville, Kubota, and CertainTeed. He knew this because he saw brand stencils on the pipe, including "J-M" and "Johns-Manville." He worked on each of these four brands "evenly" over his 10 years at EBMUD.

Nathan worked for Daly City from 1989 to 2018, doing the same type of work on asbestos-cement pipe. J-MM did not produce any records of asbestos-cement pipe sales to Daly City, but J-MM witnesses testified that its records were not comprehensive because some were missing or had been destroyed. Nathan testified that he worked on three types of asbestos-cement pipe while at Daly City: J-MM, Johns-Manville, and CertainTeed. He again had identified these brands by their stencil.

In its motion for directed verdict, J-MM argued that Cornelius had failed to produce substantial evidence that Nathan had actually worked with asbestos-cement pipe supplied by J-MM. It relied on evidence from J-MM witnesses to argue that the pipe could have been supplied by Johns-Manville, because Johns-Manville had also used a "J-M" stencil on some of its asbestos-cement pipe. Denying the motion, the trial court stated: "With regard to the argument that there's no substantial evidence of causation, because some Johns-Manvillle pipe was labeled the same as J-MM pipe, that's an argument that I believe has no merit whatsoever."

**B. *Framework and Standard of Review***

On a substantial evidence challenge, "we are bound by the 'elementary, but often overlooked principle of law that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial

21

evidence, contradicted or uncontradicted,' to support the findings below." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660 (*Jessup*), quoting *Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429.) "We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court." (*Jessup*, at p. 660.)

### C. *Analysis*

J-MM argues that Cornelius failed to present substantial evidence to support the jury's finding that he was exposed to asbestos from asbestos-cement pipe supplied by J-MM. Relying on *Izell v. Union Carbide Corp.* (2014) 231 Cal.App.4th 962 (*Izell*), J-MM contends that Cornelius only raised a "mere possibility" of such exposure.

The evidence presented in *Izell* is distinguishable from the evidence presented here. In *Izell*, the plaintiff claimed exposure to asbestos from visiting jobsites where workers were using four different brands of asbestos-containing joint compound. (*Izell*, *supra*, 231 Cal.App.4th at p. 967.) Defendant Union Carbide, a supplier of asbestos to these joint compound brands, argued there was insufficient evidence to support the liability finding. (*Id.* at p. 970.) The appellate court agreed as to Union Carbide's supply to three of the brands: there was uncontradicted evidence that Union Carbide was only a minor supplier for two of them, and that the third could not get its Union Carbide supplied product to California (where the jobsites were located). (*Id.* at pp. 971–973.) As to the fourth brand, however, the appellate court concluded there was sufficient evidence for liability because the plaintiff testified that he had inhaled dust from the specific product, and

22

the manufacturer confirmed that all asbestos used to make that product was from Union Carbide. (*Id.* at p. 974.)

Here, unlike *Izell*, there was no additional link in the supply chain that created speculation about the source of the asbestos. Nathan testified that he worked with J-MM asbestos-cement pipe during his employment at both EBMUD and Daly City and that, at least for EBMUD, he worked evenly across brands of pipe. "A single witness's testimony may constitute substantial evidence to support a finding." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.)

Nor are we persuaded by J-MM's other arguments that it was more likely that Nathan worked on pipe supplied by Johns-Manville (versus pipe supplied by J-MM from 1983 to 1988). First, J-MM suggests that Nathan only worked with "old" pipe. Even though Nathan testified that he replaced damaged pipe and agreed that, as a general principle, older pipe was more likely to be damaged than new pipe, another EBMUD witness testified that age was not the most dominant factor in pipe damage. It would have been reasonable for the jury to credit this testimony. More importantly, Nathan testified that he also worked on pipe that was not damaged (to make other replacements or repairs), and worked on pipe that had been installed as recently as six months prior.

Second, J-MM argues that Nathan had identified the "J-M" stencil before J-MM had ever started supplying asbestos-cement pipe. When asked if he saw pipe with a "J-M" stencil in the "early part" of his career, Nathan responded, "Yes." He was then asked, "And you also saw pipe in addition to having J-M and again, to clarify for the jury, the early part of your career included 1978 up before 1983 time period, that would have been part of the early part of your career, right?" He responded, "Yes." Viewing the evidence

in the light most favorable to Cornelius, as we are required to do, this testimony proves only that Nathan saw the "J-M" stencil in the "early part" of his career, and that *part* of the "early part" of his career was before 1983. (*Jessup*, *supra*, 33 Cal.3d at p. 660.) It would have been reasonable for the jury to conclude that Nathan still considered years after 1983 (while he was still at EBMUD and when J-MM had begun supplying asbestos-cement pipe) to also be part of the "early part" of his career.

Third, J-MM suggests that Nathan had no way of distinguishing pipe supplied by J-MM versus Johns-Manville, because Johns-Manville also used the "J-M" stencil on its smaller four and six-inch diameter pipe. As a preliminary matter, the relevance of this point is unclear because there was no evidence confirming the size of pipe purchased by EBMUD or Daly City, or the size of pipe worked on by Nathan.

In any event, it is reasonable that the jury would have interpreted the evidence on this point as contradictory or not credible. One witness testified that Johns-Manville put only "J-M" on its smaller diameter pipe, but its full name on larger pipes. Another witness, however, testified that Johns-Manville used "J-M" *and* "Manville" on every pipe. That same witness also stated that Johns-Manville used the "JM" stencil with no dash. J-MM asks us to infer that these were simply grammatical mistakes by its witnesses, but again, that flips the substantial evidence standard on its head. (*Jessup*, *supra*, 33 Cal.3d at p. 660.) We instead conclude it was reasonable for the jury to discredit this contradictory evidence and infer that, based on the usage of different stencils, Nathan was able to correctly distinguish between J-MM and Johns-Manville pipe.

24

In sum, we conclude there was substantial evidence to support the jury's finding that Cornelius had proven exposure from asbestos-cement pipe supplied by J-MM.[5]

### III. *Evidentiary Rulings*

### A. *Additional Background*

Before the presentation of evidence, the parties raised an issue regarding the scope of testimony at trial. The issue was whether hearsay evidence that did not fall within a hearsay exception could be presented at trial if the witness was designated by an entity as the person most qualified (PMQ) to testify on its behalf at deposition under Code of Civil Procedure section 2025.030. The trial court issued an order (hereinafter Trial Testimony Order) stating that the rules of evidence do not permit hearsay evidence at trial unless it falls within a given exception, and do not permit a witness to testify at trial to facts not within their personal knowledge. The court concluded that those rules apply with equal force to a witness who was previously designated as the PMQ for deposition.

At the end of trial, J-MM moved to admit certain exhibits into evidence. One exhibit was a document entitled "Phase 1 Asbestos Cement Pipe Corrosion Study Technical Report" from EBMUD. The report "discusses the current condition of AC pipes within the District" and "summarizes previous District AC pipe studies produced by contracted outside consultants as well as contemporary industry research for programs addressing aging AC pipe infrastructure." J-MM presented a declaration from one EBMUD employee (Antonio Martinez) that purported to authenticate the exhibit. J-MM also

_____

[5] Given this conclusion, we need not address J-MM's argument that Cornelius's experts did not close the "evidentiary gap" on exposure to asbestos-cement pipe supplied by J-MM.

25

argued that this exhibit was admissible under the business and official records hearsay exceptions, citing testimony from another EBMUD employee (Carlton Chan) who performed research used for one section of the report. Cornelius objected to the admission on multiple grounds, including lack of personal knowledge and inadmissible hearsay. The trial court excluded the exhibit. It had explained that Martinez lacked personal knowledge and could not authenticate the exhibit via declaration, and Chan might have been able to establish the official records hearsay exception for the section of the report with his research, but not for its remainder.

Another exhibit was a PowerPoint presentation entitled "AC Pipe Failure Study EBMUD Oakland, CA" from JDH Corrosion Consultants, Inc. J-MM again submitted a declaration from Martinez purporting to authenticate the exhibit. J-MM also argued that the exhibit was admissible under the business and official records hearsay exceptions. J-MM offered a declaration from J. Darby Howard, Jr., the president of the consulting firm. Cornelius objected that the declarations were hearsay. The trial court did not admit the exhibit.

J-MM also sought to admit various documents purportedly related to EBMUD's purchase requirement contracts with CertainTeed and Manville for asbestos-cement pipe during the 1980s, as well as a proposal with J-M A/C Corporation. J-MM argued that these documents would have been authenticated by testimony from EBMUD employee Kelley Smith if he had been allowed to testify about matters outside his personal knowledge. Smith testified only about his involvement producing records in response to a subpoena; the trial court sustained various objections on the grounds that Smith did not have personal knowledge as to the creation or maintenance of such records. J-MM also argued that the exhibits were admissible under the

26

business records, official records, and ancient writings hearsay exceptions. Cornelius objected that any such exception applied. The trial court excluded the exhibits.

## B. *Framework and Standard of Review*

We review rulings regarding the admissibility of evidence at trial for abuse of discretion. (*Molenda v. Department of Motor Vehicles* (2009) 172 Cal.App.4th 974, 986.) " '[T]he appropriate test of abuse of discretion is whether or not the trial court exceeded the bounds of reason, all of the circumstances before it being considered.' " (*Ibid.*) "Appellate courts will disturb discretionary trial court rulings only upon a showing of a clear case of abuse and a miscarriage of justice." (*Ibid.*)

## C. *Analysis*

J-MM challenges both the Trial Testimony Order as it relates to requiring personal knowledge for witness testimony at trial, as well as the exclusion of the report, PowerPoint presentation, and contract exhibits. On the Trial Testimony Order, J-MM argues that the trial court had a "warped view" and interpreted personal knowledge "too narrowly" for witnesses who had been designated as the PMQ for deposition, which prevented J-MM from presenting evidence to authenticate the exhibits and establish applicable hearsay exceptions. We disagree.

"The Evidence Code recognizes only two types of witnesses: lay witnesses and expert witnesses." (*LAOSD Asbestos Cases* (2023) 87 Cal.App.5th 939, 947.) The testimony of a lay witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter. (Evid. Code, § 702, subd. (a).) "There is no special category of 'corporate representative' witness," or " 'person previously designated as most knowledgeable' witness." (*LAOSD Asbestos Cases*, at p. 947.) The term

27

"person most qualified" is used in the Civil Discovery Act to describe the individual who should be designated and produced at deposition when the deponent is an entity that is not a natural person. (*LAOSD Asbestos Cases*, at p. 948.) "To state what should be obvious, the purpose of discovery is to permit a party to learn what information the opposing party possesses on the subject matter of the lawsuit, and the scope of discovery is not limited to admissible evidence." (*Ibid.*) At trial, however, testimony is bound by the rules of evidence, including that lay witnesses testify to facts within their personal knowledge. (*Ibid.*) The trial court here did not abuse its discretion in issuing an order to that effect.

On the admissibility of the report, J-MM argues that the trial court "misapprehended" the official records hearsay exception. Pursuant to Evidence Code section 1280, a writing made as a record of an act, condition, or event is not inadmissible by the hearsay rule if (a) the writing was "made by and within the scope of duty of a public employee," (b) the writing was made "at or near the time of the act, condition, or event," and (c) "[t]he sources of information and method and time of preparation were such as to indicate its trustworthiness." J-MM contends that the trial court improperly excluded the exhibit on the basis of the third element.

Citing *People v. Dunlap* (1993) 18 Cal.App.4th 1468 (*Dunlap*), J-MM argues that the official records hearsay exception can be applied even without witness testimony on this third element. But *Dunlap* observed only that court *may* admit an official record " 'without necessarily requiring a witness to testify as to its identity and mode of preparation *if the court takes judicial notice or if sufficient independent evidence shows that the record or report was prepared in such a manner as to assure its trustworthiness.*' " (*Id.* at p. 1477.) J-MM does not identify judicially noticed or independent evidence that

28

trigger this option here. Even if it did, nothing in *Dunlap* suggests that the trial court is *required* to admit a document in this manner. Nor was the trial court required to find this element satisfied pursuant to Evidence Code section 664. Section 664 provides that the trial court *may* rely on a rebuttable presumption—that an official duty has been regularly performed—as a basis for finding the foundational requirements of official records exception are met. (*Dunlap*, at p. 1477.) There is no categorical rule that it do so.

J-MM also argues that the report was admissible under the business records exception. "Although similar to the business records exception (Evid. Code, § 1271), the official records exception differs in one important respect. Evidence Code section 1271 'requires a witness to testify as to the identity of the record and its mode of preparation in every instance.'" (*Dunlap*, *supra*, 18 Cal.App.4th at p. 1477.) Here, the trial court reviewed Chan's testimony and concluded that he did not know the sources of information or method used beyond his research for one section of the report. The trial court did not abuse its discretion in reaching this conclusion.

As for the PowerPoint presentation, J-MM contends that the trial court improperly disregarded the Martinez and Howard declarations, and that the official and business records hearsay exceptions applied. But even where records are accompanied by a custodian declaration under Evidence Code 1561, the rules of evidence regarding hearsay still apply. (*Taggart v. Super Seer Corp.* (1995) 33 Cal.App.4th 1697, 1706 ["It will readily be seen that a custodian's declaration may state all the matters it is required to state under section 1561, yet fail to provide a sufficient foundation for admission of the records under section 1271"].) As explained above, the official and business records hearsay exceptions apply only if the sources of information and

29

method of preparation of such records indicate their trustworthiness. (Evid. Code, §§ 1271, 1280.) J-MM did not present admissible evidence detailing the sources of information and method of preparation for the PowerPoint presentation.[6] The trial court did not abuse its discretion in excluding the exhibit.

As for the contract exhibits, J-MM argues that Smith did not need personal knowledge to testify regarding the authenticity of these records.[7] None of the authority cited by J-MM suggests that the trial court abused its discretion in following the rule that a lay witness like Smith testify at trial to facts within his personal knowledge. (*Geary St., P. & O.R. Co. v. Campbell* (1919) 39 Cal.App. 496, 498 [secretary who had occupied position for many years testified that books of company were turned over to him in the ordinary course of business when he became such secretary, and identified them as such]; *People ex rel. Owen v. Media One Direct, LLC* (2013) 213 Cal.App.4th 1480, 1484 [trial court "was entitled to accept [witness's] assertion of personal knowledge" of actions taken, along with review of files].)

Nor are we persuaded by J-MM's argument that the authenticity of these exhibits should have been presumed under Evidence Code section 643. Section 643 provides that a "deed or will or other writing purporting to

---

[6] J-MM argues that it submitted such evidence through Martinez's trial testimony, but only cites his testimony regarding the report (not the PowerPoint presentation). California Rules of Court, rule 8.204(a)(1)(C), required J-MM to support its arguments by citation to the volume and page number of the record where the relevant matter appears.

[7] J-MM argues that Martinez also authenticated these records, but its underlying motion relied exclusively on Smith's trial testimony for authentication. (See *Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 548 [" ' "As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal" ' "].)

30

create, terminate, or affect an interest in real or personal property" is presumed to be authentic if it (a) is at least 30 years old; (b) is "in such condition as to create no suspicion concerning its authenticity," (c) was "kept, or if found was found, in a place where such writing, if authentic, would be likely to be kept or found," and (d) has been "generally acted upon as authentic by persons having an interest in the matter." J-MM offers nothing to show that the purchase requirement contracts and proposal are writings that affect a "real or personal property" interest to trigger this presumption. (Evid. Code, § 643.) Nor is it certain that the condition of these records created "no suspicion" regarding their authenticity, as Smith testified that EBMUD does not retain all of its records regarding purchase contracts. The trial court did not abuse its discretion in sustaining objections regarding the authentication of these exhibits.[8]

In sum, we conclude that the trial court did not abuse its discretion in its Trial Testimony Order or its exclusion of the report, PowerPoint presentation, and contract exhibits.[9]

## DISPOSITION

The judgment is affirmed. Respondent is entitled to his costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

---

[8] Given this conclusion, we need not address J-MM's argument that the authenticated records satisfied certain hearsay exceptions.

[9] Given this conclusion, we need not address J-MM's arguments that any abuse of discretion was prejudicial.

31

_____

Miller, J.


WE CONCUR:


_____

Stewart, P.J.


_____

Richman, J.


A162561, A163492, *Williams v. J-M Manufacturing, Inc.*

32

Court:  Alameda County Superior Court

Trial Judge:  Hon. Frank Roesch

Manning Gross + Massenburg, Carrie S. Lin; Miller Barondess, Nadia A. Sarkis; Greines, Martin, Stein & Richland, Kent L. Richland, for Defendant and Appellant

Shook, Hardy & Bacon, Andrew Trask; Fred J. Hiestand for Coalition for Litigation Justice, Inc. and Civil Justice Association of California as Amicus Curiae on behalf of Defendant and Appellant

Elmer Stahl, Robert E. Dunn for Chamber of Commerce of the United States of America as Amicus Curiae on behalf of Defendant and Appellant

Maune Raichle Hartley French & Mudd, David L. Amell, Marissa Y. Uchimura, for Plaintiff and Respondent

A162561, A163492, *Williams v. J-M Manufacturing, Inc.*